**PANHANDLE PRODUCERS AND ROYALTY OWNERS ASSOCIATION,**
Petitioner,

v.

**ECONOMIC REGULATORY ADMINISTRATION,**
Respondent.

No. 86–1058.

United States Court of Appeals,
District of Columbia Circuit.

Argued Jan. 9, 1987.

Decided June 30, 1987.

Robert C. Platt, with whom Jeffrey G. Shrader and Marc C. Johnson, Amarillo, Tex., were on brief, for petitioner.

Thomas H. Kemp, Atty., Dept. of Energy, with whom Catherine C. Cook, Atty., Dept. of Energy, Washington, D.C., was on brief, for respondent.

Before SILBERMAN, WILLIAMS and D.H. GINSBURG, Circuit Judges.

Opinion for the Court filed by Circuit Judge WILLIAMS.

WILLIAMS, Circuit Judge:

Petitioner seeks review of an Economic Regulatory Administration ("ERA") order granting Northridge Petroleum Marketing U.S., Inc. blanket authorization under § 3 of the Natural Gas Act ("NGA"), 15 U.S.C. § 717b (1982), to import limited quantities of natural gas from Canada for a two-year period. Petitioner contends, among other things, that ERA improperly relied on a policy statement issued by the Secretary of Energy in February 1984, *see* 49 FED.REG. 6684 (1984) (the "Policy Statement"). We affirm.

## I. BACKGROUND

### A. *The Statutory Scheme and Evolving Regulatory Strategy*

Section 3 of the NGA prohibits the exportation or importation of natural gas without authorization, which is to be issued "unless ... [the Commission] finds that the proposed exportation or importation will not be consistent with the public interest." 15 U.S.C. § 717b (1982).

With the creation of the Department of Energy ("DOE") in 1977, Congress reorganized administration of § 3. Department of Energy Organization Act ("DOE Act"), Pub.L. No. 95–91, 91 Stat. 565 (1977) (codified, as amended, primarily at 42 U.S.C. §§ 7101–7375 (1982)). It transformed the Federal Power Commission, which was originally charged with implementing § 3, into the Federal Energy Regulatory Commission, and shifted § 3 authority to the Secretary of Energy. *See* 42 U.S.C. § 7151(b) (1982) (granting import/export authority to Secretary); *id.* § 7172(f) (withdrawing import/export authority from FERC except to extent delegated by Secretary). The Secretary, in turn, issued delegation orders vesting most of his § 3 au-

thority in ERA. *See id.* § 7252 (authorizing delegation by the Secretary); DOE Delegation Order No. 0204–54, 44 *Fed.Reg.* 56,735, 56,735 (1979); DOE Delegation Order No. 0204–25, 43 *Fed.Reg.* 47,769, 47,772 (1978).

Until 1984, these delegation orders (especially Delegation Order No. 0204–54) guided ERA's exercise of authority over imports. ERA evaluated applications for import authority case by case, comparing the proposed selling price with that of alternative fuels. It placed on the applicant the burden of proving that authorization would be in the public interest, *see West Virginia Public Services Commission v. DOE,* 681 F.2d 847, 851 (D.C.Cir.1982), demanding specifically that applicants make a "clear showing of *regional* need—*i.e.*, a need on the applicants' particular pipeline systems that cannot be met by *domestic* gas supplies," *id.* at 860 (emphasis in original); *see Tenneco Atlantic Pipeline Co.,* 1 E.R.A. ¶ 70,103, at 70,557 (1978) ("ERA will look for a demonstration of end-user market need, as opposed to a mere showing of an interstate pipeline company's contractual obligations to deliver gas"). The declared policy also considered national "need," security of supply and effect on balance of payments. And ERA required the applicant to make a showing that the imports would not adversely affect the development of domestic supplies. *Tenneco,* 1 E.R.A. at 70,554–56. *See generally West Virginia,* 681 F.2d at 860–61.

By the Fall of 1982 it became apparent that Delegation Order No. 0204–54 was ill-matched to prevailing conditions. Long-term contracts were binding domestic producers to take Canadian gas at prices that had since become uncompetitive. *See* 49 FED.REG. at 6686. In late 1982, DOE, in conjunction with FERC and the Department of State, began to review natural gas import policy, soliciting oral and written public comments. 48 FED.REG. 34,501 (1983); 47 FED.REG. 57,756 (1982). The process culminated in the Secretary's issuance of the Policy Statement, "intended to provide a clear definition of public interest," 49 FED.REG. at 6687. The Secretary also issued Delegation Order No. 0204–111, *id.*

at 6690, explicitly superseding Delegation Order No. 0204–54. The new delegation order generally instructed ERA to follow the policies prescribed by the Secretary, and to give special (though not necessarily exclusive) attention to three factors—competitiveness of the import, need for the natural gas and security of supply. The Policy Statement discussed each of the factors at some length.

The Policy Statement declared that "[t]he policy cornerstone of the public interest standard is competition." *Id.* at 6687. Further, it "presume[d]" that if buyers and sellers could negotiate "free of constraining governmental limits, [they would] ... be responsive to market forces over time." *Id.* Accordingly, for assurance that the arrangements would be competitive, the Policy Statement looked to flexibility in a proposed transaction's contractual arrangements. So long as flexibility as to price or volume allowed the buyer to respond to changing market forces, the gas would be presumed competitive in price. An opponent of the proposed import could, however, rebut the presumption. *Id.*

Similarly, the Policy Statement still treated "need" as relevant, but viewed it as "a function of competitiveness," *id.* at 6687, and announced a second presumption:

> [I]f the imported gas is competitive in the proposed market area and, through its contract terms, will remain competitive throughout the contract period, then the rebuttable presumption exists that the gas is needed in that market.

*Id.* at 6688. Again, opponents of a particular authorization could rebut the presumption, evidently in terms of either the regional or the national market, *id.*, though the Policy Statement did not specify what evidence might be persuasive of lack of need.

Finally, the Policy Statement indicated that security of supply remained relevant, especially for long-term arrangements, and that ERA would "consider international trade policy, foreign policy, ... national security interests," and "other factors as may be appropriate...." *Id.*

### B. *The Northridge Import Authorization*

In July 1985, Northridge, a wholly owned subsidiary of a Canadian corporation, applied to ERA for blanket authorization to import up to 100 billion cubic feet ("Bcf") of Canadian natural gas over a two-year period. Northridge intended to engage in individually negotiated, short-term transactions directly with purchasers located primarily in the midatlantic and midwestern United States. It anticipated that its sales would generally displace higher-priced energy supplies. Petitioner intervened to oppose Northridge's application, requesting a trial-type hearing.

In Order No. 88, ERA gave its approval, conditioned on Northridge's quarterly reporting of the details of each transaction entered into under the authorization. Joint Appendix ("J.A.") at 100a. In accordance with the Policy Statement, ERA concluded that since each transaction during that two-year term would be freely negotiated, the transactions would only take place if the gas was competitively priced and needed. J.A. at 96a. It considered advance knowledge of the precise terms of each spot transaction unnecessary; the public interest would be fully protected by the reporting condition. *Id.* ERA also cited the Secretary's belief that short-term spot sales of the type proposed would increase competition in the natural gas market. *Id.* at 99a. ERA declined to hold an evidentiary hearing; petitioner had pressed no material issues of fact, only "issues of policy or law." *Id.* at 98a–99a; *see* 10 C.F.R. § 590.313(a) (1986). Petitioner sought rehearing, which ERA denied in Order No. 88–A, *see* J.A. at 118a–28a.

Petitioner seeks review on three grounds. First, it complains that ERA improperly relied on the Policy Statement as if it were a substantive rule. Second, petitioner argues that the Policy Statement and ERA's decision here improperly placed on petitioner the burden of proof and failed to consider necessary factors. Third, petitioner objects to the denial of a trial-type hearing.[1] We reject all three attacks. Before doing so, we briefly consider petitioner's standing.

## II. STANDING

Section 19(b) of the NGA, 15 U.S.C. § 717r(b) (1982), authorizes judicial review at the behest of any party "aggrieved" by an order thereunder. Petitioner is an association representing the interests of gas producers, royalty owners and service companies, and its members allegedly sell natural gas to interstate pipelines that import gas from Canada. J.A. at 63a. ERA contends that petitioner lacks standing to challenge Order No. 88, for want of injury in fact. We find standing.

██ Petitioner clearly asserts an injury in fact, fairly traceable to ERA's conduct and redressable by the relief sought. *See Allen v. Wright,* 468 U.S. 737, 750–52, 104 S.Ct. 3315, 3324–25, 82 L.Ed.2d 556 (1984). Order No. 88 permits entry of up to 100 Bcf of gas into the United States gas market. Under undisputed economic principles, such an increase in supply is likely to depress the prices that petitioner's members can secure. Vacation of Order No. 88 would redress the injury, sheltering petitioner's members from this adverse effect. Similarly, those allegations suffice to establish the "concrete, perceptible harm of a real, non-speculative nature" that § 19(b)'s aggrievement language demands. *Office*

---

1. Petitioner also asserts that the Policy Statement is invalid because ERA failed to refer it to the Commission as required by 42 U.S.C. § 7174(a) (1982). *See* Reply Brief for Petitioner at 4–5. While we have serious doubts as to petitioner's standing to challenge that alleged defect, we dispose of that assertion on yet a different jurisdictional ground—petitioner's failure to seek rehearing before ERA on that issue, as required by NGA § 19, 15 U.S.C. § 717r (1982). Petitioner's rehearing petition mentions § 7174, but argues only that *if* the Secretary had promulgated the Policy Statement as a *substantive rule,* he would have been required to comply with that section. *See* J.A. at 103a, 105a. As we find that the ERA was entitled to rely on the Policy Statement without substantive rulemaking, petitioner's reference to § 7174 is irrelevant. Until its reply brief before us, petitioner never contended that the agency was required by § 7174(a) to refer a *policy statement* to the Commission.

*of the Consumers' Counsel v. FERC,* 808 F.2d 125, 128–29 (D.C.Cir.1987).

Petitioner is also at least "arguably" within the zone of interests sought to be protected by § 3 of the NGA. *See Clarke v. Securities Industry Association,* ——— U.S. ———, 107 S.Ct. 750, 754–59, 93 L.Ed.2d 757 (1987); *Association of Data Processing Service Organizations, Inc. v. Camp,* 397 U.S. 150, 153, 90 S.Ct. 827, 829, 25 L.Ed.2d 184 (1970). Under both § 3 and its companion, § 7 (requiring certification for domestic transactions within the reach of the NGA), courts have found various types of competitors entitled to challenge agency decisions: competing vendors of gas, *see Cia Mexicana de Gas, S.A. v. FPC,* 167 F.2d 804, 805–06 (5th Cir.1948); suppliers of competing fuels, *see National Coal Association v. FPC,* 191 F.2d 462, 464–66 (D.C.Cir.1951) (coal); and transporters of competing fuels, *see City of Pittsburgh v. FPC,* 237 F.2d 741, 746–48 (D.C.Cir.1956) (operators of petroleum products barges).[2]

Competitors have a seemingly unbroken record of success in securing standing to challenge decisions involving agency licensing. *See, e.g., Investment Co. Institute v. Camp,* 401 U.S. 617, 620–21, 91 S.Ct. 1091, 1093–94, 28 L.Ed.2d 367 (1971); *FCC v. Sanders Brothers Radio Station,* 309 U.S. 470, 476–77, 60 S.Ct. 693, 698, 84 L.Ed. 869 (1940). This success may seem perplexing in light of many judicial assertions of a broad national policy in favor of competition in virtually every area of regulation. *See, e.g., Gulf States Utilities Co. v. FPC,* 411 U.S. 747, 757–60, 93 S.Ct. 1870, 1877–78, 36 L.Ed.2d 635 (1973); *Denver & Rio Grande Western Railroad Co. v. United States,* 387 U.S. 485, 492–93, 87 S.Ct. 1754, 1759, 18 L.Ed.2d 905 (1967); *FCC v. RCA Communications, Inc.,* 346 U.S. 86, 94, 73 S.Ct. 998, 1004, 97 L.Ed. 1470 (1953). But a license system by its very nature re-

stricts entry into a particular field or transaction. Firms already operating within the restricted area, or in competition with such firms, benefit from vigorous enforcement of the restriction. *See Sanders Brothers,* 309 U.S. at 477, 60 S.Ct. at 698. Many observers—cynics or realists, depending upon who may be describing them—suppose that the licensure schemes arise out of the political efforts of these beneficiaries. *See* Gellhorn, *The Abuse of Occupational Licensing,* 44 U.Chi.L.Rev. 6, 25 (1976); G. Stigler, The Citizen and the State: Essays on Regulation 114–34 (1975); *see also* M. Sanders, The Regulation of Natural Gas 48–54 (1981) (discussing support of NGA enactment by regulated industry, competitors and producers). But one need not be a cynic to understand competitors' success in seeking to enforce licensing barriers: their interests are generally congruent with a statutory purpose to restrict entry. Thus their position is quite different from that of competitors who assert a violation of the antitrust laws from which they would gain if it in fact occurred. *See, e.g., Matsushita Electric Industrial Co. v. Zenith Radio Corp.,* 475 U.S. 574, ———, 106 S.Ct. 1348, 1354, 89 L.Ed.2d 538 (1986) (plaintiff lacks "antitrust standing" where competitors' illegal agreement restricting output would benefit plaintiff). The difference is between plaintiffs whose interests fit the statutory purpose and those whose interests are antithetical to it. *See Clarke,* 107 S.Ct. at 756 n. 12 (zone-of-interests inquiry "seeks to exclude those plaintiffs whose suits are more likely to frustrate than to further statutory objectives"); *id.* at 757; *Water Transport Association v. ICC,* 819 F.2d 1189, 1194–1197 (D.C.Cir.1987). Here, petitioner's interest in restricted competition is at least within the outer periphery

---

**2.** The early NGA standing cases cited in the text did not always bother to assess the NGA's purposes—what later came to be referred to as the "zone of protected interests"—in determining whether a party was "aggrieved" under § 19(b). *See, e.g., City of Pittsburgh v. FPC,* 237 F.2d at 746. *But see National Coal Association v. FPC,* 191 F.2d at 464–66. After the Supreme Court articulated the zone-of-interests test in *Data Pro-*

*cessing,* 397 U.S. at 153, 157, 90 S.Ct. at 829, 831, in the context of review under § 10 of the Administrative Procedure Act, 5 U.S.C. § 702 (1982), we made it clear that the same analysis applies to NGA § 19(b). *See Northwestern Public Service Co. v. FPC,* 520 F.2d 454, 457–58 (D.C.Cir.1975); *see also Water Transport Association v. ICC,* 819 F.2d 1189, 1193 (D.C.Cir.1987).

of the interests Congress sought to advance.

## III. ERA's RELIANCE ON THE POLICY STATEMENT

■ Petitioner claims that ERA could not lawfully rely on the Policy Statement in reviewing Northridge's application. Although the argument is not finely honed, we take it to comprise two variations. First, as a policy statement cannot create a norm binding the promulgating agency or its delegate, an agency that treats such a statement as binding and conclusive is effectively failing to offer an adequate explanation for the ensuing action. *See SEC v. Chenery Corp.*, 318 U.S. 80, 94–95, 63 S.Ct. 454, 462, 87 L.Ed. 626 (1943); *cf. Brock v. Cathedral Bluffs Shale Oil Co.*, 796 F.2d 533, 537–39 (D.C.Cir.1986). Second, as a policy statement is not binding, it must be treated as nonexistent; accordingly, an ERA decision is defective if it relies *at all* on policy formulations articulated in the Policy Statement.

The first variant correctly states the law, but was not violated here; the second misstates the law. First, ERA simply did not treat the Policy Statement as establishing a binding norm. Order No. 88 states only that ERA was *"guided"* by the Policy Statement, J.A. at 95a (emphasis added); Order No. 88–A explains that ERA was not applying the Policy Statement as if it constituted "a substantive DOE rule," reiterating that it "serve[s] as a discretionary guide and advance notice to the public of the manner in which the Department has decided to exercise its" discretion, J.A. at 120a; *see also id.* at 121a ("the decision on the Northridge application was based on the facts of the arrangement, as a whole, the record, as a whole, and precedents involving similar cases, not on any application of the policy as a rule"). *Compare Community Nutrition Institute v. Young*, 818 F.2d 943, 947–49 (D.C.Cir.1987) (FDA "action levels" narrowly restrict FDA action and thus require notice-and-comment procedures).

Nor does ERA's reliance on the Policy Statement "to shift the burden of proof from the applicants to the intervenors," Brief for Petitioner at 13–14, mean that the agency treated it as a substantive rule. "An agency pronouncement is not deemed a binding regulation merely because it may have 'some substantive impact,' as long as it 'leave[s] the administrator free to exercise his informed discretion.'" *Cathedral Bluffs*, 796 F.2d at 537 (quoting *Guardian Federal Savings & Loan Association v. Federal Savings & Loan Insurance Corp.*, 589 F.2d 658, 666, 668 (D.C.Cir.1978)). Presumptions, so long as rebuttable, leave such freedom. *Regular Common Carrier Conference of American Trucking Associations, Inc. v. United States*, 628 F.2d 248, 251 (D.C.Cir.1980). This court and others have consistently stated that an agency may announce presumptions through policy statements rather than notice-and-comment rulemaking, *see, e.g., Pacific Gas & Electric Co. v. FPC*, 506 F.2d 33, 40–41 (D.C.Cir.1974), even when the presumptions have been considerably more restrictive than those established by the Policy Statement at issue here, *see, e.g., Ryder Truck Lines, Inc. v. United States*, 716 F.2d 1369, 1377 (11th Cir.1983), *cert. denied*, 466 U.S. 927, 104 S.Ct. 1708, 80 L.Ed.2d 181 (1984); *Regular Common Carrier Conference*, 628 F.2d at 251.

Had petitioner seriously attacked the reasoning of the Policy Statement, and had ERA responded merely by saying, in effect, "That is no longer open to discussion. We resolved it in the Policy Statement," then the agency's conduct would belie its characterization of the Policy Statement. *Cf. Cathedral Bluffs*, 796 F.2d at 539. But no such thing has occurred. At the core of the Policy Statement were the conclusions (1) that the pre–1984 approach was ineffective because it essentially obliged domestic consumers to purchase overpriced foreign gas for which there was no demand, and (2) that if import arrangements could be kept sufficiently flexible, domestic purchasers would take only those quantities for which there was demand at the specified price. Petitioner has never attacked these principles. Insofar as it has launched substantive attacks on the merits of the present decision, the agency has dutifully replied.

For its view that ERA should have treated the Policy Statement as a nullity, petitioner relies on our statement in *Pacific Gas & Electric Co. v. FPC* to the effect that

> [w]hen the agency applies ... [a statement of] policy in a particular situation, it must be prepared to support the policy *just as if the policy statement had never been issued.* An agency cannot escape its responsibility to present evidence and reasoning supporting its substantive rules by announcing binding precedent in the form of a general statement of policy.

506 F.2d at 38–39 (emphasis added) (footnote omitted). The italicized language does not stretch as far as petitioner suggests. Rather, it stands for no more than the indisputable proposition that when an agency announces a policy shift in a nonbinding policy statement, the new policy is not "binding precedent," but "is subject to complete attack before it is finally applied in future cases," *id.* at 39. We have never read *Pacific Gas* any differently. *See, e.g., National Latino Media Coalition v. FCC,* 816 F.2d 785, 788–89 (D.C.Cir.1987); *Guardian Federal,* 589 F.2d at 666.

## IV. BURDEN OF PROOF AND PUBLIC-INTEREST ANALYSIS

Petitioner next challenges the two presumptions announced in the Policy Statement and applied in Order No. 88: that if the contract terms are flexible enough the gas will be delivered only if it is competitive; and that if the imported gas is competitive it will fill a need. *See supra* p. 1107 (discussing presumptions under Policy Statement). Closely related is a claim that ERA erroneously failed to establish either need or lack of adverse effect on domestic drilling.

Petitioner's departure point is the Administrative Procedure Act's directive that "[e]xcept as otherwise provided by statute, the proponent of a rule or order has the burden of proof." 5 U.S.C. § 556(d) (1982). But § 3 of the NGA does provide otherwise: ERA *"shall* issue ... [an import authorization] order upon application, *unless* ... it finds that the proposed exportation or importation will not be consistent with the public interest." 15 U.S.C. § 717b (1982) (emphasis added). A presumption favoring import authorization, then, is completely consistent with, if not mandated by, the statutory directive. *See Public Service Commission v. ERA,* 777 F.2d 31, 35 (D.C. Cir.1985); *West Virginia Public Services Commission v. DOE,* 681 F.2d 847, 856 (D.C.Cir.1982); *Cia Mexicana de Gas, S.A. v. FPC,* 167 F.2d 804, 806 (5th Cir.1948). *But cf. West Virginia,* 681 F.2d at 851 (observing that ERA, under previous delegation order, placed burden on applicant).

Section 3 is in this respect the reverse of § 7(e) of the NGA, which provides that "a certificate shall be issued ... if it is found that ... the proposed service ... will be required by the present or future public convenience and necessity; otherwise such application shall be denied." 15 U.S.C. § 717f(e). While § 3 requires an affirmative showing of inconsistency with the public interest to *deny* an application, § 7 requires an affirmative showing of public convenience and necessity to *grant* one. *See Public Service Commission,* 777 F.2d at 35; *West Virginia,* 681 F.2d at 856; *Cia Mexicana,* 167 F.2d at 806. While this court in *Distrigas Corp. v. FPC,* 495 F.2d 1057, 1065 (D.C.Cir.), *cert. denied,* 419 U.S. 834, 95 S.Ct. 59, 42 L.Ed.2d 60 (1974), observed that "[t]he Commission has long regarded Section 3's 'public interest' standard and Section 7's 'public convenience and necessity' standard as substantially equivalent," we have twice since then declined to read that dictum as equating the burden allocations of the two provisions. *See Public Service Commission,* 777 F.2d at 35; *West Virginia,* 681 F.2d at 856. Thus the § 7 cases on which petitioner relies are inapposite. *See Tennessee Gas Pipeline Co. v. FPC,* 487 F.2d 1189, 1195–96 (D.C.Cir.1973); *City of Pittsburgh v. FPC,* 237 F.2d 741 (D.C.Cir.1956).

Petitioner relies on *West Virginia Public Services Commission v. DOE* for the propositions that § 3 places the burden on the applicant and that it demands that ERA establish need and absence of adverse effect on domestic drilling. The reliance is

completely misplaced. There ERA had amended the price terms under a prior authorization to import liquified natural gas. The changes would have drastically increased the "base" price and have changed the price escalation formula. 681 F.2d at 849–50. We overturned the decision. Our reversal was grounded in ERA's failure either to make supportable findings as to issues made critical by its prior decisions or to offer any explanation for disregarding those issues.

In the face of a record showing that only one of the three recipient pipelines "demonstrated any then-current need" for the gas, 681 F.2d at 861, ERA had without explanation dropped its prior insistence on evidence of regional need. Indeed, whereas it had formerly stated that direct contracting for the gas by distributors or end users was the best evidence of regional need, *id.* at 860, it had granted the amendment in the face of evidence pointing the opposite way: such firms were utterly unwilling to contract for the gas directly, *id.* at 861 & n. 69. Without explanation, the agency had vaulted over the regional-need issue and relied instead on a finding of national need. *Id.* at 861. That finding in turn rested solely on official notice. *Id.* at 861–62.

In the course of the opinion we noted, as petitioner is quick to point out, that ERA "simply failed to *put the parties to their proof,* especially as to what the true supply situation was in this country" when it approved the sale. *Id.* at 866 (emphasis added). But the defect identified was not based on *the court's* own reading of § 3; as noted above, the court explicitly found that the statute created a presumption in favor of authorization. *Id.* at 856. Rather, it referred only to the burdens that *ERA* had formerly imposed. The focus was on ERA's "unexplained break with precedent." *Id.* at 861; *see also id.* at 860–62

(discussing prior ERA precedents, including *Tenneco Atlantic Pipeline Co.,* 1 E.R.A. ¶ 70,103 (1978)); *id.* at 862 (ERA's analysis "departs in many ways from DOE policy"); *id.* at 863 ("The ERA break with precedent and policy in this case is not sustainable on the record."); *id.* at 866 (ERA's "departure from precedent and prior natural gas policy are unexplained").

In *West Virginia* we also enumerated a "broad range of factors ... which *must play a part* in the ERA's decisions on import applications. These factors include the security of supply, effects on U.S. balance of payments, and national and regional needs, as well as costs," all of which were enumerated in Delegation Order No. 0204–54. *Id.* at 865 (emphasis added) (citing Delegation Order No. 0204–54(a)). Similarly, we noted ERA precedent requiring applicants to show that the imports would not affect development of domestic supplies, *id.* at 861, 863, precedent that, again, ERA had jettisoned without explanation.

Petitioner erroneously argues that the factors enumerated in *West Virginia* "are still valid precedent and binding on ERA in this case." Brief for Petitioner at 19. The opinion was careful to point out that exactly the opposite was true.[3] ERA, we observed, is "not necessarily bound to [the] precedent" that it seemed to have abandoned. *Id.* at 863; *see also id.* at 863 n. 75 ("it is clearly within the ERA's discretion ... to depart where appropriate from presumptions and policy defined in prior cases"). As we have seen, its enumeration of factors that "must play a part" in import authorization came straight from now-superseded Delegation Order No. 0204–54, not from any judicial construction of the statute. The problem was that ERA never so much as acknowledged the inconsistency

---

**3.** Petitioner quotes selectively and creatively from *West Virginia* in an attempt to transform it into a case that stands for propositions that the court never contemplated. For example, petitioner states categorically that "this Court held that the finding of a need for the gas must be based on 'identifiable factual evidence.'" Brief for Petitioner at 16 (citation omitted). What this court actually said was that

[t]he finding of national need is so fundamental *to the entire posture adopted by the ERA in this case,* including its *departure from analysis and policy announced in prior cases,* that it must be based on identifiable factual evidence.

681 F.2d at 862 (emphasis added).

with precedent, much less provided the requisite "reasonable and contemporaneous justification for [its] departure[ ] therefrom." *Id.* at 863.

Here, by contrast, ERA has both acknowledged and provided a "reasoned analysis" for its departure from precedent. *Motor Vehicle Manufacturers Association of the United States v. State Farm Mutual Automobile Insurance Co.*, 463 U.S. 29, 57, 103 S.Ct. 2856, 2874, 77 L.Ed.2d 443 (1983) (citation and internal quotes omitted). The Policy Statement on which it relies identified the disastrous consequences flowing from the policy embodied in Delegation Order No. 0204–54 and formulated a replacement that ERA has consistently applied ever since. *See, e.g., U.S. Natural Gas Clearinghouse, Ltd.*, 1 E.R.A. ¶ 70,602, at 72,420–22 (1985); *Dome Petroleum Corp.*, 1 E.R.A. ¶ 70,601, at 72,-416–17 (1985); *Tenngasco Exchange Corp.*, 1 E.R.A. ¶ 70,596, at 72,401–03 (1985); *Northwest Alaskan Pipeline Co.*, 1 E.R.A. ¶ 70,585, at 72,367–69 (1985); *Cabot Energy Supply Corp.*, 1 E.R.A. ¶ 70,124, at 70,761–62 (1985).

As noted above, the new policy was highly flexible, creating only rebuttable presumptions and leaving parties free to assert "other factors." In rejecting the petition for rehearing here, ERA in fact responded to petitioner's assertions on the subjects of need and impact on domestic drilling. It gave a short version of Delegation Order No. 0204–111's analysis of the need issue, reiterating the proposition that purchasers would not buy competitively priced gas unless they needed it. Petitioner offered neither fact nor theory to undermine that analysis. It claimed that the record did not show that the import prices would be competitive, but that contention overlooked ERA's position that if the terms were flexible enough (allowing the price to move down and the importer to reduce volumes), no gas would be imported unless it were priced competitively.[4]

As to the suggestion that the import would discourage domestic drilling, the agency implicitly acknowledged that that might be the case. *See* J.A. at 124a. It asserted, however, that in order to foster the competition that would "benefit the gas industry and consumer alike," it was "important that neither domestic nor imported supplies are discriminated against...." *Id.* at 125a. Thus, it clearly declined to use its § 3 power to protect domestic drilling whose profitability depended on exclusion of foreign supplies.

■ In short, petitioner has posed no meritorious challenge either to the Secretary's detailed explanation for the departure from prior precedent, which ERA expressly adopted, or to the application of the new analysis in this case.

## V. TRIAL-TYPE HEARING

■ Petitioner's final contention is that it was entitled to a trial-type hearing on the issues that it disputes. It lists five:

(1) whether blanket importation authorizations are consistent with the national security objectives that Section 3 is designed to protect; (2) the identify [sic] of Northridge's prospective suppliers and purchasers and security of those supplies; (3) whether the proposed importation serves the needs of specific gas markets; (4) whether the proposed importation price is consistent with the public interest[;] and [(5)] whether the price includes brokerage fees, if any.

Brief for Petitioner at 25–26 (citation omitted). ERA's regulations provide for a hearing when a party has raised "material issues of fact genuinely in dispute," 10 C.F.R. § 590.313(a) (1986). Petitioner has raised no such issue. Issue (1) is a pure issue of policy, which ERA has reasonably explained and established in prior precedent. Since petitioner has proffered no evidence that suggests a different conclusion here, the application of that policy to this case does not require a trial-type hear-

---

4. ERA has not articulated precisely how flexible the terms must be to support the inference that the gas will be competitive. Here Northridge stated that the maximum term for any transaction would be the two-year authorization period, J.A. at 5a, and ERA clearly accepted that. Petitioner has not attacked the finding of sufficient flexibility.

ing. *See Tennessee Gas Pipeline Co. v. FPC*, 561 F.2d 955, 958 (D.C.Cir.1977). Issue (2) is immaterial to the public-interest assessment under the Policy Statement and ERA precedent, and (as we have noted) petitioner suggests no reason why it should be otherwise. Issues (3) and (4) are subject to a presumption that petitioner has neither successfully challenged nor even begun to rebut. Finally, as to issue (5), ERA has explained that

> payment of any such commission, if included in the price to Northridge's customers, is a business decision to be left to the contracting parties. If the delivered cost for the imports in the markets served is not competitive with other available supplies, the transactions would presumably not take place.

J.A. at 126a. Petitioner says nothing to contradict this view. Since brokerage fees are irrelevant to the public-interest inquiry, ERA had no duty to provide a hearing to determine whether Northridge's prices would include such fees.[5]

\* \* \* \* \* \*

Accordingly, the petition for review is *Denied.*

---

**5.** Petitioner spins a number of other claims out of the brokerage fee possibility ("other factors"). These were addressed by ERA, J.A. at 125a–26a, and appear wholly without merit.