875 F.2d 882
 277 U.S.App.D.C. 325, Energy Mgt. P 26,619
 NEW ENGLAND FUEL INSTITUTE, Petitioner,
v.
ECONOMIC REGULATORY ADMINISTRATION, Respondent,
Vermont Gas Systems, Inc., Granite State Gas Transmission,
Inc., Public Advocate, State of Maine, New England
Conference of Public Utilities Commissioners, Inc., et al.,
Alberta Northeast Gas, Limited, Intervenors.
 No. 87-1746.
 United States Court of Appeals,
District of Columbia Circuit.
 Argued Oct. 17, 1988.
Decided May 19, 1989.
 
 Gary J. Klein, with whom Robert C. Platt, Washington, D.C., was on the brief, for petitioner.
 Thomas H. Kemp, with whom Henry A. Gill and Marc Johnston, Washington, D.C., were on the brief, for respondent.
 
 
 1
 Thomas F. Brosnan, for intervenor Granite State Gas Transmission, Inc. Andrea J. Ercolano, Washington, D.C., also entered an appearance, for Granite State Gas Transmission, Inc.
 
 
 2
 Stephen G. Ward and John C. Dodge, for intervenor Public Advocate of the State of Maine, and Peter G. Ballou, Augusta, Me., for amici curiae, New England Conference of Public Utilities Com'rs, Inc., et al., were on a joint brief urging denial of the petition for review.
 
 
 3
 Frederick M. Lowther, Washington, D.C., entered an appearance, for intervenor Alberta Northeast Gas, Ltd.
 
 
 4
 Joel F. Zipp, George H. Williams, Jr., and Paul W. Diehl, Washington, D.C., entered appearances, for intervenor Vermont Gas Systems, Inc.
 
 
 5
 Before WALD, Chief Judge, and MIKVA and SENTELLE, Circuit Judges.
 
 
 6
 Opinion for the Court filed by Circuit Judge SENTELLE.
 
 SENTELLE, Circuit Judge:
 
 7
 Petitioner New England Fuel Institute ("NEFI"), an association of fuel oil distributors, has petitioned for review of a decision of respondent Economic Regulatory Administration ("ERA" or "the Administration") permitting Granite State Gas Transmission, Inc., to import Canadian natural gas. Granite State has intervened in support of ERA. Having fully considered NEFI's claims that there is an inadequate showing of public interest and that ERA erred in failing to hold a hearing when there were disputed material facts, we deny the petition.
 
 I. BACKGROUND
 
 8
 The Administration oversees importation of natural gas under section 3 of the Natural Gas Act, 15 U.S.C. Sec. 717b (1982), which is set out in full in the margin.[1] ERA's mandate under section 3 is that it "shall" approve such commerce, "unless, after opportunity for hearing, it finds that the proposed exportation or importation will not be consistent with the public interest." Id. The terms of the ERA's current authority direct it to consider "such matters as the [Administration] finds in the circumstances of a particular case to be appropriate, which may include, but are not limited to, the following matters: 1. Competitiveness of the import; 2. Need for the natural gas; 3. Security of supply." Delegation Order No. 0204-111, 49 Fed.Reg. 6,690 (1984).
 
 
 9
 The term "public interest" has not been defined by statute or regulation, but the Department of Energy has issued non-binding "policy guidelines ... intended to provide a clear definition of public interest." New Policy Guidelines & Delegation Orders From Sec'y of Energy to Economic Regulatory Admin. & Fed. Energy Regulatory Comm'n Relating to the Regulation of Imported Natural Gas [hereinafter 1984 Guidelines], 49 Fed.Reg. 6,687 (1984). The cornerstone of the rebuttable presumptions stated by those guidelines is the competitiveness of the imported gas. Arrangements that are responsive to market forces over time are presumed in the public interest; those that are not are presumed not in the public interest. Id. The guidelines assign secondary importance to security of the foreign supply, and presume need for "competitive gas," subject to rebuttal. Id. The guidelines contemplate that competitiveness will be assessed market-by-market and may even tolerate minimum volume and price provisions in some markets. Id. In general, ERA applies these guidelines in particular cases to the arrangement as a whole. See id. at 6,688.
 
 
 10
 Intervenor Granite State Gas Transmission, Inc. ("Granite State") is an interstate natural gas pipeline. It is a wholly-owned subsidiary of Northern Utilities, Inc. ("Northern Utilities"), which is itself wholly owned by Bay State Gas Company ("Bay State"). Both Northern Utilities and Bay State are local distribution companies and customers of Granite State. Northern Utilities serves Maine and New Hampshire; Bay State serves Massachusetts. Pease Air Force Base is Granite State's only other customer.
 
 
 11
 In 1986, Granite State applied to ERA for authority to import 25,000 Mcf per day of gas on an interruptible basis for the year ending October 1, 1988 and 40,000 Mcf per day (25,000 firm, 15,000 interruptible) for the period beginning November 1, 1988 and ending March 31, 1999 under the terms of a contract dated June 25, 1986 with Shell Canada Limited, a Canadian producer of natural gas. Granite State's price is two-tiered, including a demand charge based on the full firm 25,000 Mcf and a commodity charge for the gas actually taken. The commodity charge is determined by subtracting the demand charge from an adjusted base price at the border that is indexed to the price of numbers 2 and 6 fuel oil and the weighted average of Granite State's other firm gas supplies in the relevant Maine, New Hampshire, and Massachusetts markets as of October, 1985. There is no take-or-pay provision. The contract has renegotiation and arbitration clauses.
 
 
 12
 In its application, Granite State represented that it would resell approximately 20,000 Mcf of its daily firm supply to Bay State and approximately 5,000 Mcf to Northern Utilities. Granite State will transport the gas from the Canadian border to its existing pipeline terminus at Elliott, Maine, in part through a leased, converted oil pipeline spanning the border and in part through a pipeline purchased from Northern Utilities. The pipeline lease has the same term as the gas purchase contract, but is terminable by the lessor on twenty-nine months notice to Granite State as early as three years before the normal expiration date. These domestic aspects of the arrangement have been approved by the Federal Energy Regulatory Commission. Granite State Gas Transmission, Inc., 40 F.E.R.C. p 61,165, reh'g denied, 41 F.E.R.C. p 61,269 (1987).
 
 
 13
 Petitioner (NEFI) intervened in the ERA proceedings, protesting the application and requesting a trial-type hearing on its allegations that the proposed arrangement is not competitive, is not needed, and is not fair to domestic gas suppliers unable to obtain such two-tier rates. Granite State answered, but ERA requested additional information from Granite State and permitted all parties to submit additional comments, followed by third-party responses to those comments.
 
 
 14
 After this round of filings, ERA approved the application without hearings. Granite State Gas Transmission, Inc., 1 E.R.A. p 70,717 (1987). ERA found that the gas was competitive because of the market-sensitive provisions of the contract and the fact that it would be Granite State's lowest-priced firm supply, thus increasing regional intra-fuel competition. ERA also found that inter-fuel competition with fuel oil would be strengthened "in general." 1 E.R.A. p 70,717, at 72,712. ERA based this finding on Northern Utilities' and Bay State's growth in demand, partially at the expense of oil. Id. ERA found no indication that the two-part price structure would be unfair to domestic producers. Id. The Administration acknowledged evidence that the gas would be at a price disadvantage in some markets. Id.
 
 
 15
 ERA also found a need for the gas based on "persuasive" supply and demand forecasts submitted by Granite State and DOE policy in favor of displacing oil imports, as well as application of the presumption in the guidelines that competitive gas is needed. Id. at 72,713.
 
 
 16
 Finally, ERA found that the supply was secure based on the traditional reliability of Canadian sources, the reserves of Shell Canada, and--in the event of early termination of the pipeline lease--the historic procurement aggressiveness of Granite State and its affiliates. Id. at 72,713-14. ERA also based its decision on the absence of concern by intervening state agencies about the possibility of early termination and the length of the pre-termination notice. Id. at 72,714.
 
 
 17
 ERA rejected NEFI's call for a trial-type hearing on these issues, finding NEFI's concerns primarily related to policy rather than facts and that further factual development in a trial-type hearing would not materially improve the record developed through comments. Id. at 72,715.
 
 
 18
 NEFI sought rehearing, complaining of ERA's denial of a hearing and its reliance on the presumptions of the 1984 Guidelines. NEFI raised a new argument that the arrangement was competitive only at a 100% load factor. ERA rejected this argument primarily on the basis that NEFI had not demonstrated that the proposal as a whole was not sufficiently flexible to adjust to changes in the marketplace. 1 E.R.A. p 70,724, at 72,742. ERA therefore denied the request for rehearing.
 
 
 19
 NEFI's petition to this Court followed. NEFI contends in this Court that it submitted comments and evidence that showed that Granite State's proposed transaction was not competitive with alternative fuels in certain markets (as well as other objections) and therefore not in the public interest, and that ERA erred in denying its request for a trial-type hearing to develop evidence in support of its objections.
 
 II. DISCUSSION
 
 20
 A. Standing.
 
 
 21
 The Public Advocate of the State of Maine has intervened and filed a joint brief supporting respondent ERA with amici the New England Conference of Public Utilities Commissioners and the Maine Public Utilities Commission. They question whether petitioner may seek review as an "aggrieved" party, 15 U.S.C. Sec. 717r(b) (1982), since NEFI is an association of heating oil distributors in direct, alternative-fuel competition with Granite State's distributor customers and NEFI's complaints turn largely on its allegation that fuel oil will undersell the imported gas in some markets. This attack on standing is not frivolous since NEFI has been at pains to argue repeatedly that the imported gas cannot be priced competitively with NEFI's fuel oil and, therefore, is not in the public interest. The Public Advocate and amici can hardly be faulted for asking, as it were, "with enemies like the imported gas, what does NEFI need with friends?"
 
 
 22
 However, NEFI also asserts that it is injured by price competition in other markets within the scope of the arrangement and that interest is not without support in the record. We sustained a similar claim of standing in a section 3 controversy in Panhandle Producers & Royalty Owners Ass'n v. Economic Regulatory Admin., 822 F.2d 1105, 1108-10 (D.C.Cir.1987) ("Panhandle (DC) "). In that case, an association of gas producers and related entities selling domestic natural gas to interstate pipelines importing gas from Canada challenged an order of the ERA giving blanket authorization for importation of one hundred billion cubic feet of Canadian natural gas over a two-year period. ERA asserted a lack of standing for want of injury in fact. We found there that the petitioner was "at least 'arguably' within the zone of interests sought to be protected by Sec. 3 of the NGA," and therefore concluded that standing was present. Id. at 1109 (citing Clarke v. Securities Indus. Ass'n, 479 U.S. 388, 394-403, 107 S.Ct. 750, 754-759, 93 L.Ed.2d 757 (1987)). While we agree with the panel in Panhandle (DC) that the "seemingly unbroken record of success in securing standing" by competitors in licensure proceedings "may seem perplexing in light of many judicial assertions of a broad national policy in favor of competition in virtually every area of regulation," we also agree that existing precedent supported standing for the association. Id. Petitioners in the present case appear to stand on the same economic feet as the Panhandle Producers and we therefore reach the same conclusion as to standing.
 
 
 23
 B. Right to Hearing.
 
 
 24
 NEFI contends that both the Natural Gas Act and Administrative Procedure Act require a hearing when there are disputed material facts. ERA contends that the notice and comment procedures followed in the present case provide a full and fair opportunity for hearing, and that a trial-type proceeding would result in a poor allocation of the scarce assets of ERA and the contesting entities.
 
 
 25
 Section 3 provides that ERA "shall" authorize importation "unless, after opportunity for hearing, it finds that the proposed ... importation will not be consistent with the public interest." 15 U.S.C. Sec. 717b (emphasis added). ERA's regulations call for a trial-type hearing when ERA "determines that there is a relevant and material factual issue genuinely in dispute and that a trial-type hearing is necessary for a full and true disclosure of the facts." 10 C.F.R. Sec. 590.313(a) (1988). In Panhandle (DC), 822 F.2d at 1113-14, this Court held that a petitioner seeking review of a section 3 decision was not entitled to a trial-type hearing because it had not raised a material issue of fact. The Fifth Circuit similarly has held that trial is not required before every section 3 order, but only when "it would tend to enhance the accuracy of decision making; that is, only for determinations of adjudicative facts." Panhandle Producers & Royalty Owners Ass'n v. Economic Regulatory Admin., 847 F.2d 1168, 1178 (5th Cir.1988) ("Panhandle (CA5) "). As to NEFI's argument that a hearing is required by section 5 of the Administrative Procedure Act, 5 U.S.C. Sec. 554 (1982), it is sufficient to say that NEFI has cited no precedent thereunder entitling it to a trial-type hearing in the absence of disputed material facts, consistent with the ruling of this Court specific to section 3 in the Panhandle (DC) case. See also Chemical Waste Management, Inc. v. EPA, 873 F.2d 1477, 1481-1482, (D.C.Cir.1989) (repudiating presumption that statutory requirement of hearing, without more, requires on the record procedures). Therefore, ERA erred in refusing to conduct a trial-type hearing only if NEFI raised a material issue of fact.
 
 
 26
 While NEFI argued for several areas of material factual dispute at the administrative stage of the present controversy, it has preserved before us only its contentions that "Need Is A Disputed Material Fact," Brief for Petitioner at 17 ("Pet.Br."), and that "Security of Supply Is a Disputed Material Fact." Id. at 24. In neither area has NEFI shown its entitlement to a trial-type hearing. Our decision on this issue is informed by the Fifth Circuit's reasoning in Panhandle (CA5). In that case, the Fifth Circuit held that the petitioner there was not entitled to a trial-type hearing on certain issues, including " 'competitiveness' " because it "point[ed] to no evidence that would tend to rebut the analysis and presumptions contained in the 1984 Guidelines." 847 F.2d at 1178. As we will demonstrate infra, the question of "need" is, under the 1984 Guidelines, encompassed within the question of competitiveness and is supported by a further presumption therein. NEFI, like the Panhandle Producers, did not present evidence sufficient, even if believed in whole, to rebut the analysis and presumption in the Guidelines and is likewise not entitled to a trial-type hearing.
 
 
 27
 The security of supply, like other issues addressed in Panhandle (CA5), is of reduced "importance under the approach adopted by the ERA in its post-1984 orders," id., and again, based on all the record filings, it is not an issue upon which petitioner has demonstrated its entitlement to a trial-type hearing.
 
 
 28
 We note with some displeasure the near silence of ERA's brief on this question of the entitlement of petitioners to a trial-type hearing, but nonetheless cannot find that ERA erred in denying NEFI such a hearing.
 
 
 29
 C. Substantial Evidence in Support of ERA's Findings.
 
 
 30
 Section 3 requires that the Administration, upon proper application, issue authorization for the importation of natural gas "unless ... it finds that the proposed exportation or importation will not be consistent with the public interest." 15 U.S.C. Sec. 717b. It is not our duty to second guess the Administration on this decision but we must determine " 'whether each of the order's essential elements is supported by substantial evidence.' " West Va. Pub. Servs. Comm'n v. U.S. Dep't of Energy, 681 F.2d 847 (D.C.Cir.1982) (quoting Permian Basin Area Rate Cases, 390 U.S. 747, 792, 88 S.Ct. 1344, 1373, 20 L.Ed.2d 312 (1968)). In the present case, the Administration's conclusion that the proposed arrangement was not inconsistent with the public interest was underlain by findings that the arrangement is competitive, that the natural gas is needed, and that the arrangement enhances security of supply. Since we conclude from the record that each of these findings is supported by substantial evidence, we will deny the petition for review.
 
 1. Competitiveness
 
 31
 The first key finding by ERA is that the gas imported under the proposed arrangement will be competitive. 1 E.R.A. p 70,717, at 72,712-13. The 1984 Guidelines prescribe that "the competitiveness of an import arrangement is now the primary consideration for authorization." 49 Fed.Reg. 6,687. While the ERA's opinion in the present case is perhaps more terse than we might like, it does reference substantial evidentiary support for the conclusion of competitiveness.
 
 
 32
 The Administration referenced the fact that the contract includes no take-or-pay clauses, contains a two-part demand/commodity pricing structure, a monthly price adjustment provision, an annual price renegotiation clause, and an arbitration provision. The Administration further noted that the new supply would be the least expensive of Granite State's firm gas supplies, would have the effect of lowering the cost of gas supplies to Granite State's customers by replacing high cost winter supplemental supplies such as liquid natural gas and propane, and that the proposed import would have the effect of increasing competition among natural gas suppliers in the New England market. Evidence before the Administration and referenced by its opinion showed that the gas would compete with oil to the extent of availability of the new lower cost supply and would enable Granite State's distribution customers potentially to expand their markets at the expense of oil. The Administration further referenced evidence of substantial growth in demand by distribution customers during the preceding several years and the similarity of the arrangement to domestic pipeline arrangements utilizing two-part rates. 1 E.R.A. p 70,717, at 72,712.
 
 
 33
 NEFI's filings offered evidence and arguments attacking specific aspects of the proposed agreement and calling into question the price competitiveness of the imported gas in specific submarkets within the New England region. However, none of NEFI's filings destroyed the substantial evidence that the arrangement, taken as a whole, provided for a competitive import. Under the 1984 Guidelines, "[t]hose opposing an import have to show that the arrangement, as a whole, is not competitive or sufficiently flexible to respond to changing market conditions." 49 Fed.Reg. 6,688. The Administration's finding of competitiveness of the gas did meet the requirement of section 19(b) of the NGA that administrative findings "as to the facts, if supported by substantial evidence, shall be conclusive." 15 U.S.C. Sec. 717r(b).
 
 
 34
 Of course, the substantial evidence test is not the only filter for the Administration's decision. In the present case, NEFI had requested a trial-type hearing, which the Administration denied. Although NEFI did not brief for us the separate question of competitiveness as a material factual issue, it did treat that question in its argument on the related subject of the proposed factual issue of "need." But on the present record, we cannot fault the Administration's determination that all of NEFI's filings, if believed, were insufficient to place the factual issue of competitiveness "genuinely in dispute" to the extent "that a trial-type hearing [was] necessary for a full and true disclosure of the facts." 10 C.F.R. Sec. 590.313(a). As the Fifth Circuit noted in Panhandle (CA5), petitioner has pointed "to no evidence that would tend to rebut the analysis and presumptions contained in the 1984 Guidelines." 847 F.2d at 1178. ERA here, as in Panhandle (CA5), has found in the proposed arrangement the very elements of flexibility and negotiated terms for protection of the purchasing party against changes in the market which the Guidelines contemplate as indicia of competitiveness.
 
 
 35
 The Guidelines expressly refer to such contract provisions as "the volume of gas under contract, base price, price review or adjustment mechanisms," and express the intention that
 
 
 36
 [c]ontracts should also contain provisions to protect the parties in the event of changes in the circumstances in which the contract is expected to operate, and to permit contractual adjustments in such circumstances. Examples of such provisions include renegotiation clauses, arbitration clauses, "market-out" clauses, and similar arrangements.
 
 
 37
 1984 Guidelines, 49 Fed.Reg. 6,688. The compliance of the present arrangement with the Guidelines is amply supported by the record evidence before the Administration. As in Panhandle (CA5), "the ERA was entitled to rely on the 1984 Policy Guidelines," 847 F.2d at 1178, and petitioners, like those in Panhandle (CA5), have "point[ed] to no evidence that would tend to rebut the analysis and presumptions contained in the 1984 Guidelines." Id. While we will refer to the presumptions in some slightly expanded detail in our discussion of the element of need, we hold that as to competitiveness the ERA's finding is supported by substantial evidence, and we will not disturb it.
 
 2. Need
 
 38
 The second necessary finding underlying the determination that the arrangement is in the public interest is the "[n]eed for the natural gas." 49 Fed.Reg. 6,690. The 1984 Guidelines specify that "[n]eed for a gas supply is intrinsically related to its anticipated marketability." Id. at 6,688. The Guidelines, therefore, presume need from competitiveness.
 
 
 39
 [I]f the imported gas is competitive in the proposed market area and, through its contract terms, will remain competitive throughout the contract period, then the rebuttable presumption exists that the gas is needed in that market.
 
 
 40
 Id.
 
 
 41
 The ERA's opinion expressly relies on that presumption. Although the ERA held no trial-type hearing, it did provide NEFI ample opportunity to submit written filings of the proposed evidence and contentions with which it proposed to rebut the presumption: "Despite ample opportunity, NEFI's data and arguments have not rebutted the presumption and do not persuade the ERA that the proposed import is not needed." 1 E.R.A. p 70,717, at 72,713.
 
 
 42
 ERA did not rest alone on the presumption, but noted the particular vulnerability of the New England region to disruptions in energy supplies, given its "undue dependence on imported oil supplies." Id. The opinion further notes the evidence before it of "the growth in the gas requirements of [Granite State's] customers and its current inability to obtain additional firm supplies from its domestic pipeline suppliers." Id. Finally, ERA relies on the position taken by the Office of Public Advocate of the State of Maine that " 'the additional ... volumes will have the immediate beneficial effect of reducing the need for costly supplemental gas send-out during winter months.' " Id. (quoting Response of the Office of Public Advocate of the State of Maine to March 17, 1987 Order of the Administration).
 
 
 43
 Thus, as with competitiveness, the Administration appropriately supports its findings with substantial evidence. However, NEFI asserts that ERA has improperly applied presumptions and improperly allocated the burden of proof.[2] As NEFI views the subject, the burden of establishing competitiveness lay with the proponent of the arrangement. Once Granite State established competitiveness, need would be presumed by the 1984 Guidelines. But, NEFI argues, a presumption cannot shift the ultimate burden of proof once evidence negating competitiveness or need was offered by the opponents. In support of this proposition, NEFI first relies on Harlem Taxicab Ass'n v. Nemesh, 191 F.2d 459, 561 (D.C.Cir.1951), where we applied the Thayer or "bursting bubble" theory of presumptions to the effect that when a presumption is met by substantial evidence to the contrary, it " 'falls out of the case.' It never had and cannot acquire the attribute of evidence in the claimant's favor. Its only office is to control the result where there is an entire lack of technical evidence." Id. (quoting Del Vecchio v. Bowers, 296 U.S. 280, 286, 56 S.Ct. 190, 193, 80 L.Ed. 229 (1935)).
 
 
 44
 NEFI then cites Pennzoil v. Federal Energy Regulatory Comm'n, 789 F.2d 1128, 1136-37 (5th Cir.1986), which holds that the Thayer or "bursting bubble" theory of presumptions still holds sway under Rule 301 under the Federal Rules of Evidence. Whether or not the Thayer rule does in fact hold sway under the Federal Rules of Evidence, we need not visit that question in this case. We have already approved in Panhandle (DC) the two presumptions involved here: "that if the contract terms are flexible enough the gas will be delivered only if it is competitive; and that if the imported gas is competitive it will fill a need." 822 F.2d at 1111. Those presumptions need not shift the burden of proof to the party asserting uncompetitiveness and a lack of need, because the burden was never away from it in the first place. While the Administrative Procedure Act directs that "[e]xcept as otherwise provided by statute, the proponent of a rule or order has the burden of proof," 5 U.S.C. Sec. 556(d) (1982), in the instant case "section 3 of the NGA does provide otherwise." Panhandle (DC), 822 F.2d at 1111. As we noted in Panhandle (DC), that statute requires that ERA " 'shall issue ... [an import authorization order] upon application, unless ... it finds that the proposed exportation or importation will not be consistent with the public interest.' " 15 U.S.C. Sec. 717b (1982) (emphasis, deletions, and insertion supplied in Panhandle (DC), 822 F.2d at 1111). As we further noted there, "[a] presumption favoring import authorization, then, is completely consistent with, if not mandated by, statutory directive." 822 F.2d at 1111 (citations omitted). In that case we held, consistent with our prior decisions in Public Serv. Comm'n v. Economic Regulatory Admin., 777 F.2d 31, 35 (D.C.Cir.1985), and West Va. Pub. Servs. Comm'n v. U.S. Dep't of Energy, 681 F.2d 847, 856 (D.C.Cir.1982), that the Administration did not err in relying on the presumptions and placing the burden on the opponent consistent with section 3 of the NGA, "requir[ing] an affirmative showing of inconsistency with the public interest to deny an application." 822 F.2d at 1111 (emphasis in original).
 
 
 45
 Once again, as in Panhandle (DC), we find that the Administration has properly relied on the presumptions, and made appropriate finding based on substantial evidence including the presumptions. Again, as in Panhandle (DC), we conclude that the petitioner's disagreements are largely as to policy, and that the petitioner here as there has not provided the Administration with a sufficient evidentiary filing to put "material issues of fact genuinely in dispute." 10 C.F.R. Sec. 590.313(a). Here, as there, we will not disturb the ERA's findings.
 
 3. Security of Supply
 
 46
 The final finding made by the Administration and required by the 1984 Guidelines, 49 Fed.Reg. 6,688, and Delegation Order No. 0204-111, 49 Fed.Reg. 6,690, relates to security of supply under the proposed arrangement. Again, the Administration properly relied on a presumption created in the 1984 Guidelines. "Security of proposed import supply can be demonstrated by reference to the historical reliability of the supplier to provide a dependable source of gas to the United States and other countries." Id. at 6,688. The Administration expressly found that "[n]atural gas has been imported from Canada for many years, and there has been no instance of a major natural gas supply interruption that would call into question Canada's future reliability as a supplier of natural gas to this country." 1 E.R.A. p 70,717, at 72,713. The Administration further noted that the Canadian supplier, "Shell, has natural gas reserves that are in excess of its obligations under this proposed import arrangement." Id. While NEFI argued before the Administration and this Court that the supply was rendered less secure by the fact that the ten and one-half year term of Granite State's pipeline lease with Portland was subject to an early termination after seven and one-half years, the Administration properly noted that the lease required a twenty-nine month notice of such an early termination decision. The Administration further required Granite State to provide evidence of a contingency plan if the pipeline lease was terminated early and found adequate evidence of provision for the contingency. Id. at 72,713-14. NEFI's filings and arguments to the contrary do not undercut the substantial evidentiary basis for the Administration's findings, and we will not disturb the Administration's result.
 
 III. CONCLUSION
 
 47
 While NEFI has advanced other arguments, both at the administrative level and before this Court, we have examined all in full and find none that warrant separate discussion or the granting of any relief. We, therefore, deny the petition for review and affirm the Administration's decision.
 
 
 48
 It is so ordered.
 
 
 
 [1]
 Exportation or importation of natural gas
 After six months from June 21, 1938, no person shall export any natural gas from the United States to a foreign country or import any natural gas from a foreign country without first having secured an order of the Commission authorizing it to do so. The Commission shall issue such order upon application, unless, after opportunity for hearing, it finds that the proposed exportation or importation will not be consistent with the public interest. The Commission may by its order grant such application, in whole or in part, with such modification and upon such terms and conditions as the Commission may find necessary or appropriate, and may from time to time, after opportunity for hearing, and for good cause shown, make such supplemental order in the premises as it may find necessary or appropriate.
 15 U.S.C. Sec. 717b (1982).
 Administration of the section lay with the Federal Power Commission until transferred to the Department of Energy and delegated to ERA. See generally Panhandle Producers & Royalty Owners Ass'n v. Economic Regulatory Admin., 822 F.2d 1105, 1106-07 (D.C.Cir.1987). Administration was transferred from ERA after oral argument in this case, see 54 Fed.Reg. 11,436 (1989), but that fact causes no change in our decision.
 
 
 [2]
 NEFI makes these arguments throughout, but it is only in reference to need and competitiveness that the arguments even require comment