899 F.2d 1250
 283 U.S.App.D.C. 265, 58 USLW 2614
 ASSOCIATED GAS DISTRIBUTORS, American Public Gas
Association, Algonquin Customer Group, Cascade Natural Gas
Corporation, Michigan Consolidated Gas Company, and Southern
California Gas Company, Petitioners,
v.
FEDERAL ENERGY REGULATORY COMMISSION, Respondent,
Tejas Power Corporation, Intermountain Gas Company, Columbia
Nitrogen Corporation, ONG Transmission Company, et al.,
Amoco Production Company, Arco Oil and Gas Company, et al.,
Exxon Corporation, Pacific Gas and Electric Company,
Phillips 66 Natural Gas Company, American Paper Institute,
Inc., Arkansas Gas Consumers, Fertilizer Institute, Texas
Inc. and Texaco Producing, Inc., Intervenors.
ASSOCIATED GAS DISTRIBUTORS, Algonquin Customer Group, and
Cascade Natural Gas Corporation, Petitioners,
v.
FEDERAL ENERGY REGULATORY COMMISSION, Respondent,
Chevron Chemical Company, Intermountain Gas Company, Paiute
Pipeline Company, Arco Oil and Gas Company, et al., Amoco
Production Company, Washington Water Power Company, American
Paper Institute, Inc., Hadson Gas Systems, Inc., Northwest
Natural Gas Company, Northwest Pipeline Corporation, Intervenors.
ASSOCIATED GAS DISTRIBUTORS and Algonquin Customer Group, Petitioners,
v.
FEDERAL ENERGY REGULATORY COMMISSION, Respondent,
Tejas Power Corporation, Public Service Electric & Gas
Company, Arco Oil and Gas Company, et al., Amoco Production
Company, CNG Transmission Corporation, The American Paper
Institute, Inc., Equitrans, Inc., Hadson Gas Systems, Inc.,
Niagara Mohawk Power Corporation, Northwest Pipeline
Corporation, Pennzoil Exploration, et al., Texas Eastern
Transmission Corporation, Texaco, Inc., et al., Intervenors.
TEJAS POWER CORPORATION, Petitioner,
v.
FEDERAL ENERGY REGULATORY COMMISSION, Respondent,
Arco Oil and Gas Company, CNG Transmission Corporation,
Public Service Electric and Gas Company, Amoco Production
Company, Public Service Commission of the State of New York,
Hadson Gas Systems, Inc., Long Island Lighting Company,
Texaco, Inc., et al., The Municipal Defense Group, Texas
Eastern Transmission Corporation, Associated Gas
Distributors, et al., Orange and Rockland Utilities, Inc.,
Intervenors.
CASCADE NATURAL GAS CORPORATION, Petitioner,
v.
FEDERAL ENERGY REGULATORY COMMISSION, Respondent.
 Nos. 88-1856 to 88-1858, 88-1862 and 89-1577.
 United States Court of Appeals,
District of Columbia Circuit.
 Argued Feb. 27, 1990.
Decided April 6, 1990.
Rehearing and Rehearing En Banc Denied June 4, 1990.
 
 Petitions for Review of Orders of the Federal Energy Regulatory Commission.
 M. Lisanne Crowley, with whom Frederick Moring and Joseph M. Oliver, Jr., for Associated Gas Distributors, William T. Miller and Susan N. Kelly, for American Public Gas Association, John S. Schmid, Gerald L. Knowles and Barbara K. Heffernan, for Algonquin Customer Group, Ted P. Gerarden, Washington, D.C., for Cascade Natural Gas Corporation, and Douglas K. Porter, Los Angeles, Cal., for Southern California Gas Co., were on the joint brief for petitioners, Associated Gas Distributors, et al. in Nos. 88-1856, 88-1857, 88-1858, 89-1577 and intervenors in No. 88-1862. Richard A. Oliver, Washington, D.C., for Hadson Gas Systems, Inc., Eddie R. Island, Los Angeles, Cal., for Southern California Gas Co., and Steven W. Snarr, for Northwest Pipeline Corp., also entered appearances for petitioners.
 John M. Hopper, Jr., for petitioner Tejas Power Corp. in No. 88-1862 and intervenor in Nos. 88-1856, 88-1857, 88-1858 and 89-1577. Richard E. Powers, Jr., Washington, D.C., also entered an appearance, for Tejas Power Corp.
 Dwight C. Alpern, Atty., F.E.R.C., with whom Jerome M. Feit, Sol., F.E.R.C., was on the brief, for respondent in all cases. Hanford O'Hara, Atty., F.E.R.C., Washington, D.C., also entered an appearance, for respondent.
 
 
 1
 Kevin M. Sweeney, Washington, D.C., with whom Kathleen E. Magruder, Houston, Tex., for Arco Oil and Gas Co., William H. Penniman, for Process Gas Consumers Group, et al., Thomas E. Hirsch, III, and Gregory D. Chafee, for American Paper Institute, Jack M. Wilhelm, for Amoco Production Co., Stephen A. Herman, Newark, N.J., for The Fertilizer Institute, Philip G. Marston and Robert Y. Hirasuna, for Hadson Gas Systems, Inc., John B. Chapman and John K. McDonald, Washington, D.C., for Pennzoil Co. and John P. Beall, for Texaco Inc., were on the joint brief, for intervenors in No. 88-1856, 88-1857, 88-1858 and 88-1862. Robert F. Shapiro also entered an appearance, for intervenor, American Paper Institute, Inc.
 
 
 2
 Mary Ann Walker, Boston, Mass., entered an appearance, for intervenor, Intermountain Gas Co.
 
 
 3
 Frederic G. Berner, Jr. and Lisa J. Gefen, Washington, D.C., entered appearances, for intervenor, Columbia Nitrogen Corp.
 
 
 4
 William I. Harkaway, Douglas M. Canter, Washington, D.C., and C. Burnett Dunn entered appearances, for intervenors, ONG Transmission Co., et al.
 
 
 5
 Richard A. Drom, Washington, D.C., entered an appearance, for intervenor, Amoco Production Co.
 
 
 6
 C. Roger Hoffman entered an appearance, for intervenor, Exxon Corp. and Exxon Gas System, Inc.
 
 
 7
 Steven F. Greenwald and Lindsay How-Downing entered appearances, for intervenor, Pacific Gas and Elec. Co.
 
 
 8
 John L. Williford, Larry Pain and Luke A. Mickum entered appearances, for intervenor, Phillips 66 Natural Gas Co.
 
 
 9
 Stephen A. Herman, Newark, N.J., entered an appearance, for intervenor, Arkansas Gas Consumers.
 
 
 10
 Ronald E. Christian and Tom Rattray, Washington, D.C., entered appearances for intervenor, Indiana Gas Co., Inc.
 
 
 11
 John M. Hopper, Jr. entered an appearance, for intervenor, Pennzoil Exploration and Production Co.
 
 
 12
 Henry S. May, Jr., Houston, Tex., Kathleen C. Lake and Judy M. Johnson entered appearances, for intervenor, Texas Eastern Transmission Corp.
 
 
 13
 Glenn S. Howard entered an appearance, for intervenors, Process Gas Consumers Group, et al.
 
 
 14
 David J. Evans and Daniel John Regan, Jr. entered appearances, for intervenor, Chevron Chemical Co.
 
 
 15
 David J. Meyer entered an appearance, for intervenor, Washington Water Power Co.
 
 
 16
 Robert A. Nelson, Jr. entered an appearance, for intervenor, Northwest Natural Gas Co.
 
 
 17
 James R. Lacey entered an appearance, for intervenor, Public Service Electric & Gas Co.
 
 
 18
 John E. Holtzinger, Jr., Washington, D.C., and Kevin J. Lipson entered appearances, for intervenor, CNG Transmission Corp.
 
 
 19
 Gary E. Guy, Washington, D.C., entered an appearance, for intervenor, Equitrans, Inc.
 
 
 20
 Harry H. Voigt, M. Reamy Ancarrow, Mindy A. Buren and Diane B. Schratwieser, Washington, D.C., entered appearances, for intervenors, Niagara Mohawk Power Corp. and Orange and Rockland Utilities, Inc.
 
 
 21
 Richard A. Solomon and David D'Alessandro entered appearances, for intervenor, Public Service Com'n of the State of N.Y.
 
 
 22
 James J. Stoker, III and James F. Bowe, Jr. entered appearances, for intervenor, Long Island Lighting Co.
 
 
 23
 Stanley W. Balis and Demetrios G. Pulas, Jr., Washington, D.C., entered appearances, for intervenor, The Municipal Defense Group.
 
 
 24
 Edward Myers entered an appearance, for intervenor, Orange and Rockland Utilities, Inc.
 
 
 25
 Before WALD, Chief Judge and MIKVA and EDWARDS, Circuit Judges.
 
 
 26
 Opinion for the Court filed by Chief Judge WALD.
 
 WALD, Chief Judge:
 
 27
 Does Sec. 311 of the Natural Gas Policy Act of 1978 authorize the Federal Energy Regulatory Commission to exempt any transportation of natural gas from the requirements of Sec. 7 of the Natural Gas Act so long as some intrastate pipeline or local distribution company receives some economic benefit from the transportation? That is the central question posed by these cases, and we think the only reasonable answer is no. Accordingly, since the orders before us rest on an unacceptably broad interpretation of the Commission's power under Sec. 311, we vacate them and remand the cases for further proceedings.
 
 I. BACKGROUND
 
 28
 This proceeding is the latest in a series dealing with the efforts of the Federal Energy Regulatory Commission ("FERC" or "Commission") to "restructure the natural gas industry along lines more competitive than it had traditionally followed." American Gas Ass'n v. FERC, 888 F.2d 136, 141 (D.C.Cir.1989). We have on several recent occasions recounted the history and purpose of these efforts. See Associated Gas Distributors v. FERC, 893 F.2d 349 (D.C.Cir.1989); American Gas Ass'n v. FERC, 888 F.2d 136 (D.C.Cir.1989); Associated Gas Distributors v. FERC, 824 F.2d 981 (D.C.Cir.1987), cert. denied, 485 U.S. 1006, 108 S.Ct. 1468, 99 L.Ed.2d 698 (1988). To put the present case in perspective, we briefly review the nature of the natural gas market, the reasons why FERC is attempting to foster competition in the market, and the role that Sec. 311 of the Natural Gas Policy Act ("NGPA") plays in the FERC's grand design.
 
 
 29
 Natural gas is produced at the "wellhead." There is today a competitive marketplace in the interstate sale of gas at the wellhead, see 824 F.2d at 994, and there would be little need for regulation at all if the ultimate consumers of gas had ready access to the wellhead marketplace. However, natural gas cannot simply be brought to market in a truck, like produce; it must be transported through pipelines, and the construction of a gas pipeline requires considerable capital expense. Although some (indeed, increasingly many) pipelines face competition for customers from other pipelines, still other pipelines enjoy a monopoly or oligopoly position, because their customers must buy natural gas from them or not at all.
 
 
 30
 The Natural Gas Act ("NGA"), 15 U.S.C. Secs. 717-717z (1988), serves to protect consumers of natural gas from the monopoly power of interstate pipelines. 824 F.2d at 995. It gives the FERC regulatory jurisdiction over the transportation and sale of gas in interstate commerce. Section 7 of the NGA, 15 U.S.C. Sec. 717f, prohibits any natural gas company from engaging in transportation or sale of gas subject to the Commission's jurisdiction unless the Commission has issued a "certificate of public convenience and necessity," commonly known as a Sec. 7 certificate, authorizing the transaction. The FERC can issue such certificates only after a hearing upon notice to all interested parties. Furthermore, Sec. 4 of the NGA, 15 U.S.C. Sec. 717c, requires all rates and charges for transportation or sale of gas within the FERC's jurisdiction to be "just and reasonable," and Sec. 5, 15 U.S.C. Sec. 717d, gives the FERC power to alter any such rate or charge if it determines the rate or charge to be "unjust, unreasonable, unduly discriminatory, or preferential."
 
 
 31
 Traditionally, the FERC required a person wishing to transport gas in interstate commerce to apply for a Sec. 7 certificate for each, individual transportation agreement with a customer. This burdensome requirement meant that pipelines had to make extensive filings and participate in hearings before each transportation contract. However, in 1985 the FERC promulgated its landmark Order No. 436, 50 Fed.Reg. 42,408 (1985) (codified at scattered sections of 18 C.F.R. (1989)). In this order, the FERC observed that in the nearly 50 years since the passage of the NGA in 1938, the pipeline industry had changed and matured. In particular, sufficient pipelines had been constructed that there existed for the first time an interconnected nationwide pipeline grid, which had the potential to transport a particular supply of gas to a purchaser almost anywhere in the nation, if only the owners of the pipelines along the way would agree to the transportation. See 50 Fed.Reg. at 42,414.[1] The difficulty, however, was that interstate pipelines could and did refuse to transport gas for parties other than those who bought gas directly from them. The general practice was for interstate pipelines to sell natural gas that they owned, "bundled" together with the service of transporting it; they did not choose to transport gas owned by their competitors. See 824 F.2d at 996. Accordingly, the Commission sought in Order No. 436 to "unbundle" the sale of gas from the sale of gas transportation services; it retained its utility-type regulation over the interstate transportation function, while allowing the market for the commodity of natural gas itself to develop competitively. See 50 Fed.Reg. at 42,413.
 
 
 32
 The Commission's plan was this: in place of the traditional Sec. 7 certificate, the Commission would issue "blanket" Sec. 7 certificates, that authorized a pipeline's transportation services generally, and set only ceil ing and floor rates that the pipeline could charge for transportation. In return, however, any pipeline seeking a blanket certificate had to agree to become an "open access" transporter: it must transport, on a first-come, first-served basis, gas owned by anyone who requested transportation, even though such transportation would compete with transportation of the pipeline's own gas. See id. at 42,424-26; 824 F.2d at 996. In this way, customers would be enabled to purchase gas at the wellhead.[2]
 
 
 33
 Another key element of the FERC's plan concerned the integration of the interstate and intrastate natural gas markets. The NGA, as mentioned earlier, gives FERC jurisdiction over the transportation of gas in interstate commerce. FERC lacks jurisdiction over the transportation of gas in intrastate commerce; the states regulate such transportation. However, if gas crosses a state line at any time from its production at the wellhead to its consumption at the burner tip, then that gas is deemed to be "in interstate commerce" throughout the entire journey. California v. Lo-Vaca Gathering Co., 379 U.S. 366, 369, 85 S.Ct. 486, 488, 13 L.Ed.2d 357 (1965). Accordingly, there were traditionally two separate markets in natural gas that could not interact: the interstate market, made up of interstate pipelines, and the intrastate market, made up of intrastate pipelines and local distribution companies ("LDCs"). No intrastate pipeline could sell gas to an interstate pipeline for resale in another state, even if the sale took place within the state where the gas originated, without itself becoming a seller of gas in interstate commerce. The consequence of this separation of the two markets was that an undesirably large amount of gas remained locked within the intrastate market, where the price of gas, not being subject to FERC regulation, was higher than the price charged in the regulated interstate market. See Peters, Interstate and Intrastate Pipeline Transportation of Natural Gas Under Section 311 of the Natural Gas Policy Act of 1978, 2 J.Energy L. & Pol'y 143, 143 (1982).
 
 
 34
 Congress responded to this situation in 1978 with passage of the Natural Gas Policy Act ("NGPA"), 15 U.S.C. Secs. 3301-3432 (1988). Section 311 of the NGPA, 15 U.S.C. Sec. 3371, gives FERC the authority to authorize, by rule or order, any interstate pipeline to transport gas on behalf of any intrastate pipeline or LDC, and to authorize any intrastate pipeline to transport gas on behalf of any interstate pipeline or LDC, all without the need for a Sec. 7 certificate.[3] This section gave FERC the power to "facilitate[ ] development of a national natural gas transportation network without subjecting intrastate pipelines, already regulated by State agencies, to [FERC] regulation over the entirety of their operations." H.R.Rep. No. 543, 95th Cong., 1st Sess. 45 (1977), U.S.Code Cong. & Admin.News 1978, pp. 7659, 7712. Transportation by interstate pipelines under Sec. 311 must still be at "just and reasonable" rates, see Sec. 311(a)(1)(B), and transportation by intrastate pipelines under Sec. 311 must be at "fair and equitable" rates, see Sec. 311(a)(2)(B), so the transportation does not entirely escape FERC regulation. The key, however, is that Sec. 311 transportation is not subject to the Sec. 7 certificate requirement, and can therefore occur without prior FERC authorization.
 
 
 35
 FERC first exercised its Sec. 311 power in Order No. 46, 44 Fed.Reg. 52,179 (1979), defining the transportation it would allow to take place outside its jurisdiction. Order No. 46 authorized any interstate pipeline to transport gas on behalf of any intrastate pipeline or LDC, without a Sec. 7 certificate, but only for a period not exceeding two years, and only where the transported natural gas was "delivered directly or indirectly, to an interstate pipeline, intrastate pipeline, or [LDC], which receives such natural gas for its system supply for resale." Id. at 52,185. Six years later, however, in Order No. 436, the FERC decided that the purpose of integrating the intrastate and interstate gas markets would best be served by expanding the coverage of Sec. 311; accordingly it dropped the two-year limitation and the "system supply" requirement, so that the current form of the Sec. 311 regulation merely tracks the statute, and authorizes any interstate pipeline to transport gas on behalf of any intrastate pipeline or LDC without prior Commission approval. 18 C.F.R. Sec. 284.102. In keeping with the general plan of Order No. 436, however, the Commission requires any pipeline wishing to engage in Sec. 311 transportation to do so on a nondiscriminatory, "open access" basis. 18 C.F.R. Secs. 284.8(b), 284.9(b). Thus, a pipeline engaging in any Sec. 311 transportation must accept all transportation requests that fall within Sec. 311.
 
 
 36
 Although the FERC, in Order No. 436, used the statutory phrase "on behalf of" to describe the set of transportation transactions it was authorizing under Sec. 311, it did not define that phrase. FERC's regulation therefore led to litigation concerning the scope of transportation transactions that fall within Sec. 311. Three such litigations are before the court today.
 
 
 37
 A. Hadson Gas Systems Inc., 44 F.E.R.C. p 61,082 (1988)
 
 
 38
 Hadson Gas Systems, Inc. filed a petition for a declaratory order with the FERC, requesting that the FERC clarify the meaning of the phrase "on behalf of" as used in Sec. 311 of the statute and Sec. 284.102 of the regulations. FERC gave notice of this petition by publication in the Federal Register, and over 50 parties intervened in the Hadson proceeding. The Hadson proceeding thus became the major vehicle for FERC's consideration of the scope of Sec. 311.
 
 
 39
 After considering the comments of all parties, the FERC declared that natural gas is transported "on behalf of" an intrastate pipeline or LDC whenever an intrastate pipeline or LDC receives "some economic benefit" from the transportation. 44 F.E.R.C. at 61,250. FERC reasoned that "a restrictive view of the 'on behalf of' test would have the effect of denying producers, transporters, and end-users access to markets and transportation and would be inconsistent with the Commission's policy of establishing a competitive market." Id. at 61,252-53. FERC therefore adopted the broad "some economic benefit" test, and also clarified that the party on whose behalf gas is transported may derive its economic benefit from an "agency relationship" with the party requesting transportation from an interstate pipeline.
 
 
 40
 B. Cascade Natural Gas Corp. v. Northwest Pipeline Corp., 44 F.E.R.C. p 61,081 (1988)
 
 
 41
 The breadth of FERC's "some economic benefit" test was demonstrated by the two other cases involved in this consolidated appeal. Cascade Natural Gas Corporation was an LDC operating in the state of Washington. One of its customers was the Chevron Chemical Company, to whose plants in Washington Cascade delivered natural gas. In 1988, the Northwest Pipeline Corporation, an interstate pipeline that supplied Cascade, announced that it would begin delivering gas directly to the Chevron plant under Sec. 311. This transportation purportedly took place on behalf of Intermountain Gas Company, an LDC located in Idaho, and later on behalf of Llano, Inc., an intrastate pipeline located in New Mexico, and Corpus Christi Industrial Pipeline Company, an intrastate pipeline located in Texas. See Brief for Respondents at 10 n. 5. These entities had designated Chevron U.S.A. (Chevron Chemical's corporate parent) as their agent for purchasing gas, and they received a fee for doing so, but they had no other connection with the transportation transaction. Cascade claimed that these "agency" transactions fell outside the scope of Sec. 311.
 
 
 42
 By the time the case reached the FERC, Northwest had obtained a blanket Sec. 7 certificate, and was transporting gas to Chevron's plants under the blanket certificate rather than under Sec. 311. Accordingly, FERC dismissed the complaint of illegality under Sec. 311 as moot. 44 F.E.R.C. at 61,246.[4] However, the FERC reiterated that an agency agreement can provide the necessary nexus between the transportation and the party on whose "behalf" the transportation takes place, provided that party receives some economic benefit from the transaction. Id.
 
 
 43
 C. Texas Eastern Transmission Corporation, 44 F.E.R.C. p 61,080 (1988)
 
 
 44
 In Texas Eastern, the Tejas Power Corporation complained to FERC that Texas Eastern, an interstate pipeline, had refused to provide it with transportation service under Sec. 311 and the open-access regulations. Tejas had submitted a Sec. 311 request to Texas Eastern during a "window" period established by Texas Eastern's tariff. All requests received during this period were to have equal status in the "first come, first served" transportation queue. However, Texas Eastern had rejected Tejas' request because Texas Eastern, according to Tejas, considered a transportation request to be "on behalf of" an authorized entity only if that entity either (1) had title to the gas to be transported or (2) itself transported the gas at some point during its movement. Texas Eastern described Tejas' requested transportation as follows:
 
 
 45
 (a) a marketer of natural gas requests a transportation agreement to be implemented pursuant to Sec. 311,
 
 
 46
 (b) the marketer requests receipt points located in a multiple number of states and ... delivery points located in other states,
 
 
 47
 (c) the marketer advises the interstate pipeline that the transportation is on behalf of an intrastate pipeline qualified to do business in a state other than the states in which the points of receipt or points of delivery are located, [and]
 
 
 48
 (d) the intrastate pipeline on whose behalf the agreement is to be rendered is a corporate affiliate of the marketer and does not at any time transport the gas or have title to the gas during transportation by the interstate pipeline[.]
 
 
 49
 44 F.E.R.C. at 61,241. Texas Eastern requested a declaratory order that the described transaction did not fall within Sec. 311. Tejas requested emergency clarification of Texas Eastern's tariff.
 
 
 50
 The FERC held that the transportation proposed by Tejas, as described by Texas Eastern, would satisfy the agency test for "on behalf of" entities which the Commission adopted in Hadson. Tejas' motion was therefore granted. Id. at 61,242. Like Cascade, this case therefore established that the intrastate pipeline or LDC on whose behalf transportation purportedly takes place need have no physical relationship to the transportation, and may indeed have no relationship to the transportation at all other than that of receiving a fee for agreeing to say that the transportation takes place on its behalf. However, FERC refused to order Texas Eastern to grant Tejas the queue position it would have had if Texas Eastern had accepted Tejas' transportation request when originally filed, on the ground that to do so would be unfair to those shippers that had not requested service because they knew Texas Eastern would reject their requests.
 
 
 51
 Associated Gas Distributors ("AGD"), an association of LDCs, petitioned this court for review of all three decisions, claiming that FERC's interpretation of Sec. 311 is impermissibly broad. Numerous parties intervened on the side of the FERC, claiming that the interpretation is lawful. Tejas separately petitioned for review of the Texas Eastern decision, claiming that FERC should have ordered Texas Eastern to restore Tejas to its rightful place in the transportation queue.
 
 II. JURISDICTION
 A. Standing
 
 52
 Before we reach the merits of these claims, we must insure that the petitioners have standing to raise them.[5] The standing requirement has two parts. First, the petitioners must satisfy the constitutional standing requirement; that is, they must have asserted an injury in fact, fairly traceable to the challenged actions of the respondent, and likely to be redressed by a favorable court ruling. Allen v. Wright, 468 U.S. 737, 751, 104 S.Ct. 3315, 3324-25, 82 L.Ed.2d 556 (1984). Second, the petitioners must satisfy the prudential standing requirement that the interest they seek to protect be arguably within the zone of interests protected by a relevant statute. Clarke v. Securities Industry Ass'n, 479 U.S. 388, 396, 107 S.Ct. 750, 755-56, 93 L.Ed.2d 757 (1987).
 
 
 53
 Petitioner AGD meets the constitutional standing test. As an association, AGD has standing to challenge the Commission's interpretation of Sec. 311 if (1) its members would otherwise have standing to sue in their own right, (2) the interests AGD seeks to protect are germane to its purpose, and (3) neither the claim nor the relief requested requires the participation of individual members in this lawsuit. Hunt v. Washington State Apple Advertising Comm'n, 432 U.S. 333, 343, 97 S.Ct. 2434, 2441, 53 L.Ed.2d 383 (1977). No party claims that the second and third prongs of this test are not satisfied, and we think they clearly are. The only issue is whether AGD's members would have standing to sue in their own right.
 
 
 54
 The Commission's interpretation of Sec. 311 authorizes transportation and sale of gas that AGD claims cannot be authorized under the relevant statute. These newly authorized transactions threaten AGD's members competitively, because AGD's members include LDCs who may lose business to allegedly illegal Sec. 311 transactions. Those who must compete with allegedly illegal commercial transactions have Article III standing to challenge a regulatory order authorizing the transactions. Investment Company Institute v. Camp, 401 U.S. 617, 91 S.Ct. 1091, 28 L.Ed.2d 367 (1971) (mutual fund management companies may challenge regulation that authorizes banks to manage mutual funds); Panhandle Producers & Royalty Owners Ass'n v. ERA, 822 F.2d 1105, 1108 (D.C.Cir.1987) (gas producers may challenge order authorizing importation of gas from Canada, since that gas would compete with theirs). Indeed, this court heard on the merits a very similar challenge to the broadening of Sec. 311 authorizations that was accomplished by Order No. 436 itself, see AGD v. FERC, 824 F.2d at 1042, and although standing was not explicitly discussed, the court dealt with the parties' contention that the broadening of Sec. 311 authorizations "open[ed] the way for interstate pipelines to invade the core markets of LDCs without prior FERC approval or the approval of the state regulatory commission." Id. (internal quotation omitted).
 
 
 55
 The intervenors claim that AGD's fear that its members will have to compete with allegedly illegal Sec. 311 transactions is purely speculative, but that is not correct. At least one LDC has already been bypassed by allegedly illegal Sec. 311 transportation, in the Cascade case. Although that transportation has terminated, and therefore cannot itself form the basis for standing, it demonstrates that AGD's members face more than an idle threat of competition from allegedly illegal Sec. 311 pipeline deliveries. In Investment Company Institute v. FDIC, 815 F.2d 1540 (D.C.Cir.), cert. denied, 484 U.S. 847, 108 S.Ct. 143, 98 L.Ed.2d 99 (1987), mutual fund companies challenged, as violative of the Glass-Steagall Act, an FDIC regulation that permitted nonmember insured banks to have subsidiary or affiliate relationships with firms engaged in securities work. In holding that the petitioners had constitutional standing on the basis of competitive injury, the court cited no specific instances of existing competition, but noted that "[t]he FDIC will deal petitioners competitive injury by allowing insured non-member banks to enter the securities field indirectly through subsidiaries and affiliates," and that the regulation "plainly threatens" economic injury. Id. at 1543. We find here, similarly, that petitioners sufficiently establish their constitutional standing by showing that the challenged action authorizes allegedly illegal transactions that have the clear and immediate potential to compete with the petitioners' own sales. They need not wait for specific, allegedly illegal transactions to hurt them competitively.
 
 
 56
 Furthermore, even in the unlikely event that no AGD member ever faces direct competition from allegedly illegal Sec. 311 transportation, the FERC's interpretation of Sec. 311 causes competitive injury to AGD members in another way. As part of their business, AGD members purchase transportation services from interstate pipelines. As the Texas Eastern case before us demonstrates, under the FERC's open access, nondiscrimination policies, all such purchasers must compete, on a first-come, first-served basis, for access to the finite transportation capacity of such pipelines. If the FERC's interpretation of Sec. 311 prevails, it will force interstate pipelines to accept requests for transportation transactions that the petitioners claim are illegal, and will therefore leave less pipeline capacity for the transactions of the petitioners, and force their requests into less favorable positions in the transportation access queue. Indeed, Tejas itself (which as things currently stand has established the legitimacy of its transportation request but lost its place in the queue) observes that if AGD's view of Sec. 311 prevails, "the LDCs with pre-established high queue priorities would thereby assure themselves of preferential access to precious pipeline transportation capacity, to the exclusion of virtually all other shippers." Brief for Petitioner Tejas at 12 n. 6. It is clear, therefore, that AGD's members have important access advantages riding on the outcome of this case. For this reason as well as the likely possibility of direct competition in sales, petitioners have adequately demonstrated the requisite injury for constitutional standing to challenge the FERC's orders.
 
 
 57
 Petitioners must also demonstrate that they are at least arguably within the zone of interests sought to be protected by a relevant statute (which need not necessarily be the statute that is allegedly violated). See Clarke v. Securities Industry Ass'n, 479 U.S. at 394-401, 107 S.Ct. at 754-758. As we remarked in Panhandle, "[c]ompetitors have a seemingly unbroken record of success in securing standing to challenge decisions involving agency licensing." 822 F.2d at 1109. The petitioners here, like the petitioners in Panhandle, would benefit from vigorous enforcement of the licensing requirements of the nation's natural gas laws; their interests too "are generally congruent with a statutory purpose to restrict entry." Id. Accordingly, we think they are within the zone of interests of Sec. 7 of the NGA, which is clearly a relevant statute. The petitioners therefore have standing to seek review of the Commission's orders.
 
 B. Ripeness
 
 58
 The intervenors also claim that the Commission's orders are not ripe for review, inasmuch as they are merely general statements of agency policy not giving rise to any aggrievement. In support of this claim, the intervenors cite cases such as Industrial Safety Equipment Ass'n, Inc. v. EPA, 837 F.2d 1115 (D.C.Cir.1988), in which we dismissed as unripe challenges to agency statements that did not "impose an obligation, determine a right or liability or fix a legal relationship." Id. at 1120. These cases, we think, are inapposite. The FERC's interpretation of Sec. 311 determines the right of parties such as Tejas to demand transportation services from interstate pipelines, and imposes an obligation on parties such as Texas Eastern to accept them. The interpretation also has the present effect of allowing transportation transactions to bypass LDCs without any further FERC action. The interpretation therefore has a "direct effect on the day-to-day business" of interstate pipelines and LDCs, Abbott Laboratories v. Gardner, 387 U.S. 136, 152, 87 S.Ct. 1507, 1517, 18 L.Ed.2d 681 (1967), and is presently ripe for review.
 
 III. MERITS
 
 59
 As is demonstrated by the cases on review, the Commission's interpretation of Sec. 311 allows any transportation of gas by any interstate pipeline anywhere in the country to qualify as transportation "on behalf of" an intrastate pipeline or LDC, provided only that the shipper can find such an entity, anywhere, that is willing to accept a fee in return for lending its name to the transaction.[6] Since it costs an intrastate pipeline or LDC nothing to do this (and since the "on behalf of" entity may even be the corporate affiliate of the party requesting transportation), it seems unlikely that there would be any transportation transaction that could not be made to qualify under Sec. 311. The FERC's interpretation thus makes Sec. 311 a means by which pipelines could structure virtually any gas transportation so as to take place outside FERC's Sec. 7 jurisdiction. The question before us is whether this is a permissible interpretation.
 
 
 60
 In determining whether the FERC has permissibly interpreted the NGPA, a statute which Congress entrusted FERC to administer, we apply the principles of Chevron U.S.A., Inc. v. NRDC, 467 U.S. 837, 104 S.Ct. 2778, 81 L.Ed.2d 694 (1984). First, we must decide "whether Congress has directly spoken to the precise question at issue." Id. at 842, 104 S.Ct. at 2781. In determining the intent of Congress, we must look to "the particular statutory language at issue, as well as the language and design of the statute as a whole," K Mart Corp. v. Cartier, Inc., 486 U.S. 281, 108 S.Ct. 1811, 1817, 100 L.Ed.2d 313 (1988), and we must employ traditional tools of statutory construction, including, where appropriate, legislative history. Ohio v. United States Department of the Interior, 880 F.2d 432, 441 (D.C.Cir.1989). If the intent of Congress is clear, we must give it effect. 467 U.S. at 842-43, 104 S.Ct. at 2781-82 ("Chevron step one"). If, however, the statute is silent or ambiguous on a particular issue, we must defer to the agency's interpretation of the statute if it is reasonable and consistent with the statutory purpose. Id. at 844-45, 104 S.Ct. at 2782-83 ("Chevron step two").[7]
 
 
 61
 In this case, we do not think Congress has answered the precise question at issue--the maximum permissible scope of Sec. 311. Section 311 limits the set of transportation transactions that FERC can approve by rule or order to those that are "on behalf of" intrastate pipelines and LDCs, but the statute does not define the phrase "on behalf of." The phrase does not appear to be a term of art with a specifically limited meaning, and certainly the term could have several possible meanings as a matter of common usage. The term could refer narrowly to carriage of gas owned by the "on behalf of" entity, or to gas transported at some time by that entity, or it could have a broader meaning. We think Representative John Dingell correctly informed his colleagues that
 
 
 62
 [t]he authority of Sec. 311 is broad and is supplemented by the general rulemaking powers vested in the Commission in Sec. 501 of the Act. It is anticipated that this authority, in conjunction with the authority to define terms used in the legislation, will afford FERC substantial discretion with respect to the implementation of Sec. 311 in particular cases.
 
 
 63
 124 Cong.Rec. 38,366 (1978). That is, Congress vested FERC with discretion to interpret the phrase "on behalf of" in Sec. 311, and intended that FERC use this discretion in a way that furthered the policies of the statute. Accordingly, we find that the intent of Congress is not clear, and we move on, under Chevron step two, to consider whether the Commission's interpretation is reasonable and consistent with the statutory purpose. We conclude that it is not.
 
 
 64
 The difficulty with the FERC's interpretation of Sec. 311 is its potential wholly to undermine the regime created by Sec. 7 of the NGA. We think that all the indications--Sec. 311's language, its history and its purpose--show that the section is a limited exception to the requirements of Sec. 7, and was never intended to work a sweeping change in the requirement that gas transportation be authorized by a certificate issued prior to the transportation. We therefore find the FERC's interpretation to be unreasonable.
 
 
 65
 The language of Sec. 311 is, on its face, limited. In enacting the NGPA, Congress certainly had the power to say, and could easily have said, that henceforth it would be within the FERC's discretion to do away with Sec. 7 certificates in any case in which the FERC thought them unnecessary. But Congress did not do this. Rather, Congress gave FERC power to eliminate the Sec. 7 certificate only with respect to interstate pipelines transporting gas on behalf of an intrastate pipeline or LDC.[8]
 
 
 66
 Although "on behalf of" is not a precise term, to say that party A is transporting something on behalf of party B is, in common parlance, to suggest that a relationship exists between party B and the transportation itself. Section 311's legislative history provides examples of the sorts of transportation transactions it was intended to authorize, and they illustrate this relationship. For instance, the House Report, commenting on FERC's power to authorize intrastate pipelines to transport gas on behalf of interstate pipelines, said, "[t]his authority may save interstate pipelines great expense by avoiding the need to duplicate intrastate pipeline routes in order to obtain natural gas from producing areas presently served only by intrastate pipeline systems." H.R.Rep. No. 543, 95th Cong., 1st Sess. 45 (1977), U.S.Code Cong. & Admin.News 1978, p. 7712. This example suggests a scenario in which an interstate pipeline would like to purchase gas from a particular wellhead, has no pipeline to that wellhead, but is connected to an intrastate pipeline that goes to the wellhead. Section 311 would allow the intrastate pipeline to transport gas out to the interstate pipeline without subjecting its other operations to FERC's jurisdiction.
 
 
 67
 Similarly, after Senators Pearson and Bentsen introduced the predecessor of Sec. 311 on the Senate floor, Senators Domenici and Pearson engaged in a colloquy concerning the meaning of the provision:
 
 
 68
 Mr. DOMENICI. Am I correct in interpreting the provisions of section 28(a)(1) of amendment no. 1039 [which, as modified in conference, later became section 311] as permitting an interstate pipeline to transport intrastate natural gas without that natural gas becoming subject to the jurisdiction of the Commission under the Natural Gas Act?Mr. PEARSON. That is correct, subject to the Commission's power to set the rate or price to be paid to the interstate pipeline for the transportation ... and to deny approval of the transportation arrangement if it were to threaten or impede the interstate pipelines capacity to transport jurisdictional natural gas to its regular or jurisdictional customers. Stated another way, it is contemplated that the Commission would deny approval of such an arrangement if the interstate pipeline did not possess excess transportation capacity.
 
 
 69
 . . . . .
 
 
 70
 Mr. DOMENICI. Thank you. In asking these questions I am concerned with a situation which exists in my State. There are a number of communities in New Mexico, served by pipelines that are in curtailment. As you know, New Mexico is a significant producer of natural gas. In some areas of the State we have many properties with potential marginal production that will not justify the construction of pipelines to transport the production to these distressed communities. However, interstate pipeline facilities are nearby and have the excess capacity to transport this gas but the owners of the gas are reluctant to transport it through the interstate facilities for fear of the attachment of Commission jurisdiction over the natural gas with all of its consequences. If I understand this provision correctly, these legal impediments would be removed. Is that correct?
 
 
 71
 Mr. PEARSON. You are correct.
 
 
 72
 123 Cong.Rec. 32,293 (1977). Like the House Report, this colloquy suggests that Sec. 311 had the purpose of approving a limited set of transactions, particularly those in which wasteful, duplicative construction could be saved by allowing one pipeline to transport gas on behalf of another. Senator Pearson explicitly noted that transportation under this section should not be allowed if it would interfere with an interstate pipeline's jurisdictional transportation, thereby making clear that the section's purpose was not to afford the Commission a means of exempting all or almost all gas transportation from the Sec. 7 jurisdictional requirements. Thus, although the legislative history does not provide us with any general discussion of the maximum permissible scope of Sec. 311, the examples of its intended use, like the common meaning of "on behalf of," do suggest some closer nexus between the transportation and the party on whose behalf the gas is transported than the receipt of a money payment by that party.[9]
 
 
 73
 Furthermore, the FERC's interpretation of Sec. 311 does not serve the section's purpose. The purpose of the section, as we held in AGD v. FERC, 824 F.2d at 1042, is to integrate the interstate and intrastate gas markets, and the FERC's interpretation of the section bears no relationship to this purpose. FERC argues that in allowing the broadest possible set of transactions to take place under Sec. 311, it has best served the section's purpose of integrating the two markets: the more transportation allowed under Sec. 311, the better the mar kets will be integrated, FERC apparently believes. This argument, however, proves too much. It would justify any interpretation of Sec. 311, no matter how broad.
 
 
 74
 In enacting Sec. 311, Congress did not simply authorize certain transactions. It distinguished between an interstate pipeline's transportations that are on behalf of an intrastate pipeline or LDC and those that are not, allowing the former to proceed by order, while maintaining the requirement of a Sec. 7 certificate for the latter. It is to this distinction that the FERC must give meaning, and the meaning should serve the section's purpose. Under FERC's interpretation, however, the section distinguishes between transportation transactions on a basis that is quite unrelated to the purpose of integrating the interstate and intrastate gas markets.
 
 
 75
 A concrete example makes this point clear. Suppose a shipper buys gas at a wellhead in New Mexico, has it transported to Arizona via an interstate pipeline, and sells it directly to an end-user there, with no intrastate pipeline or LDC participating in or receiving any benefit from the transaction. All parties agree that this transportation could not fall under Sec. 311. But now suppose that the same transaction takes place, except that the shipper pays a fee to an LDC in Maine, and claims that the transportation is on behalf of that LDC. According to FERC, this transaction should be allowed to come within Sec. 311, in order to serve the purpose of integrating the interstate and intrastate gas markets. But what does the payment of money to the LDC in Maine have to do with that purpose? Surely these two hypothetical transactions either both serve, or both do not serve, the purpose of integrating the two gas markets. Indeed, we cannot imagine any purpose that is served by distinguishing between these two transactions, and the fact that FERC's interpretation does so suggests strongly that it is unreasonable.
 
 
 76
 The problem is that the LDC's role in the second hypothetical transaction is completely unrelated to the fact that it is an LDC. All it does is receive money, and anyone could do that. Distinguishing between identical transportation arrangements solely on the basis of a payment made to an LDC or intrastate pipeline that has no other stake in the transportation surely cannot be said to further Congress' purpose in facilitating interstate-intrastate transportation arrangements.
 
 
 77
 The language, history, and purpose of Sec. 311 thus compel us to conclude that the FERC's interpretation of the section is too broad to survive scrutiny even under the deferential standard of review we use on an administrative agency's interpretation of an ambiguous statute. This case, moreover, has exceptional implications for the agency's potential ability to waive a fundamental statutory requirement for an entire industry. When Congress enacted the NGPA in 1978, the Sec. 7 certificate requirement had been a central feature of federal regulation of natural gas for forty years. See, e.g., Atlantic Refining Co. v. Public Service Comm'n, 360 U.S. 378, 389, 79 S.Ct. 1246, 1253-54, 3 L.Ed.2d 1312 (1959) ("In view of this framework in which the Commission is authorized and directed to act, the initial certificating of a proposal under Sec. 7(e) of the Act as being required by the public convenience and necessity becomes crucial"); Consumer Federation of America v. FPC, 515 F.2d 347, 356 (D.C.Cir.) ("preservation of the statutory scheme depends on diligent enforcement of the Sec. 7 certification requirement as a holding operation on initial rates"), cert. denied, 423 U.S. 906 (1975). It is not reasonable to suppose that Congress, by means of the obscure language of Sec. 311, and without so much as a hint in the legislative history, intended to authorize the Commission to superannuate the Sec. 7 regulatory scheme.
 
 
 78
 Consumer Federation of America v. FPC, 515 F.2d 347 (D.C.Cir.), cert. denied, 423 U.S. 906, 96 S.Ct. 208, 46 L.Ed.2d 136 (1975), dealt with a similar issue. In that case, the Commission, in response to projected gas shortages, exempted from the Sec. 7 certificate requirements all gas sales of 180 days duration made to pipelines experiencing or facing threatened curtailment of service. Id. at 349. The purported authority for this order was Sec. 7's "emergency" exemption, which provides that the Commission
 
 
 79
 may issue a temporary certificate in cases of emergency, to assure maintenance of adequate service or to serve particular customers, without notice or hearing, ... and may by regulation exempt from the requirements of this section temporary acts or operations for which the issuance of a certificate will not be required in the public interest.
 
 
 80
 15 U.S.C. Sec. 717f(c). The Commission argued for a broad interpretation of these powers to cover all curtailment situations, but the court held that such an interpretation would undermine the NGA's basic regulatory regime. The court found that the legislative history suggested that Congress intended only a narrow exception to the fundamental Sec. 7 requirement, and concluded that "[t]he exemption clause is not a broad blade to cut a wide swath out of the basic landscape of certification after due hearings. What it permits is a more modest kind of pruning, like the temporary certificate available for emergency trimming pending hearings." Id. at 354. In this case, similarly, we think the FERC is impermissibly attempting to take a section that Congress intended as a limited exception to the basic Sec. 7 requirement and turn it into a means by which virtually any gas transportation could potentially take place without a Sec. 7 certificate. The inherent implausibility of FERC's interpretation of Sec. 311, combined with the interpretation's potential to undermine a central feature of federal gas regulation, convinces us that the interpretation is unreasonable.
 
 
 81
 The petitioners, on the other hand, ask us to declare that Sec. 311 would be satisfied only by a transaction in which the "on behalf of" entity transported the gas at some point during its journey or owned it for some part of the transportation in question. We certainly think that FERC could, if it chose, limit Sec. 311 to such transactions: in them, the "on behalf of" entity plays a role that has an important connection to its status as an intrastate pipeline or LDC. However, we do not think it would be appropriate for us to decide in this case that only such transactions can satisfy Sec. 311. We think FERC could permissibly read the statute to allow other transactions, so long as the "on behalf of" entity in the transaction is related to the transportation of gas by an interstate pipeline in a way that reflects its status as an intrastate pipeline or LDC.
 
 
 82
 In the final analysis, the task of interpreting Sec. 311 is primarily the FERC's. We have explained the defect in the interpretation that is before us, but since this is not a Chevron step one case, it would be inappropriate for us to impose some other interpretation, for which FERC does not argue. Inasmuch as we have decided that Congress did not set the specific limits of "on behalf of" by statute, it is up to the FERC to choose the proper interpretation of that phrase, within reason and consistent with the purposes of the statute.
 
 IV. THE PARTICULAR CASES
 
 83
 We now state how our ruling affects each of the cases on review.
 
 A. Hadson
 
 84
 Since Hadson was a declaratory proceeding in which the FERC declared the interpretation of Sec. 311 that we now find to be impermissible, we vacate the Hadson order and remand the case for further proceedings consistent with this opinion.
 
 B. Cascade
 
 85
 Since Northwest pipeline no longer transports gas pursuant to Sec. 311, the petitioners concede that there is no practical relief that this court can grant them in the particular case. Accordingly, we agree with the FERC that the Sec. 311 issue in the Cascade case (the only issue on appeal) is moot. To the extent, however, that the order on review reiterates the FERC's impermissible interpretation of Sec. 311, see 44 F.E.R.C. at 61,245-46, we vacate the order. See United States v. Munsingwear, Inc., 340 U.S. 36, 71 S.Ct. 104, 95 L.Ed. 36 (1950); Northwest Pipeline Corp. v. FERC, 863 F.2d 73, 78-79 (D.C.Cir.1988). With regard to the other issues that FERC's order resolves, we leave the order untouched.C. Texas Eastern
 
 
 86
 The FERC granted Tejas' motion for clarification of Texas Eastern's tariff, relying on the impermissible interpretation of Sec. 311 established by Hadson. We vacate the FERC's order and remand the case for further proceedings.[10]
 
 
 87
 Tejas independently petitioned for review of the FERC's order, claiming that the FERC erred in not restoring it to its rightful queue position. However, Tejas conceded that its claim would be moot if AGD prevailed on the issue of the interpretation of Sec. 311. Reply Brief for Petitioner Tejas at 3 n. 2. Accordingly, we dismiss Tejas' petition for review.
 
 V. CONCLUSION
 
 88
 The orders on review in Hadson and Texas Eastern are vacated and remanded for further proceedings consistent with this opinion. The order on review in Cascade is vacated to the extent indicated in Part IV(B) of this opinion and the petition for review is dismissed as moot. Tejas' petition for review is dismissed as moot.
 
 
 89
 It is so ordered.
 
 
 
 [1]
 Since natural gas is fungible, its "transportation" does not always take the form of the physical carriage of a particular supply of gas from its starting point to its destination. Just as Western Union can "transport" money from one place to another by accepting cash at the starting point and paying out different, but equivalent, cash at the destination, so too pipelines transport gas by "backhaul" (the process of accepting gas at one point in a pipeline's flow and delivering an equivalent amount of gas at a destination point that is actually "upstream" from the point of entry), "exchange" (a process in which one party delivers gas to another party at one place in exchange for receiving gas from that party at another place), and "displacement" (a process in which, because of a pipeline's configuration, it is not clear whether gas moves forward or backward from the point of receipt). In this opinion, as in FERC's regulations, the term "transportation" is used to embrace all these methods of transporting natural gas. See 50 Fed.Reg. at 42,431-32; 18 C.F.R. Sec. 284.1(a)
 
 
 [2]
 This court upheld most elements of Order No. 436 in AGD v. FERC, 824 F.2d 981 (D.C.Cir.1987), cert. denied, 485 U.S. 1006, 108 S.Ct. 1468, 99 L.Ed.2d 698 (1988), but remanded the record on certain issues. The Commission issued an interim order, Order No. 500, 52 Fed.Reg. 30,334 (1987), dealing with the "take or pay" issue. That order too was challenged, and this court reversed and remanded it for further consideration in AGA v. FERC, 888 F.2d 136 (D.C.Cir.1989), and AGD v. FERC, 893 F.2d 349 (D.C.Cir.1989). The validity of Order No. 436 is not before us today
 
 
 [3]
 Section 311 reads in pertinent part:
 Authorization of certain sales and transportation
 (a) Commission approval of transportation.
 (1) Interstate pipelines.
 (A) In general. The Commission may, by rule or order, authorize any interstate pipeline to transport natural gas on behalf of--
 (i) any intrastate pipeline; and
 (ii) any local distribution company.
 (B) Just and reasonable rates. The rates and charges of any interstate pipeline with respect to any transportation authorized under subparagraph (A) shall be just and reasonable (within the meaning of the Natural Gas Act).
 (2) Intrastate pipelines.
 (A) In general. The Commission may, by rule or order, authorize any intrastate pipeline to transport natural gas on behalf of--
 (i) any interstate pipeline; and
 (ii) any local distribution company served by any interstate pipeline.
 (B) Rates and charges.
 (i) Maximum fair and equitable price. The rates and charges of any intrastate pipeline with respect to any transportation authorized under subparagraph (A) ... shall be fair and equitable[.]
 15 U.S.C. Sec. 3371.
 
 
 [4]
 FERC decided various other issues in the case that are not on appeal
 
 
 [5]
 The FERC does not challenge the standing of petitioners, but the intervenors do, and in any case it is our duty to assure ourselves that petitioners do indeed have standing. See Hazardous Waste Treatment Council v. EPA, 861 F.2d 270, 272 (D.C.Cir.1988)
 
 
 [6]
 There was some dispute at oral argument as to whether the fee must be substantial or whether the payment of a peppercorn to an LDC would suffice to satisfy the FERC's "some economic benefit" test. We do not think the point material to our decision
 
 
 [7]
 Petitioner AGD, citing Michigan Consolidated Gas Co. v. FERC, 883 F.2d 117 (D.C.Cir.1989), petition for cert. filed, 58 U.S.L.W. 3491 (U.S. Jan. 24, 1990) (No. 89-1161), argues that courts should give no deference to an agency's determination regarding its own jurisdiction. See id. at 122 n. 3. However, just as in that case we found it unnecessary to pass on the point because the agency's action was sustainable even under the least deferential standard of review, we find it unnecessary to pass on the point here because the agency's action is not sustainable even under the most deferential standard of review
 
 
 [8]
 The section also, of course, gives FERC power to authorize intrastate pipelines to transport gas on behalf of interstate pipelines and LDCs, and to allow intrastate pipelines to sell gas to interstate pipelines and LDCs. We focus here on transportation by interstate pipelines since that is the principal issue in the case
 
 
 [9]
 To the extent that this court discussed the meaning of "on behalf of" in AGD v. FERC, 824 F.2d 981 (D.C.Cir.1987), cert. denied, 485 U.S. 1006, 108 S.Ct. 1468, 99 L.Ed.2d 698 (1988), the court's opinion foreshadows our holding today. One petitioner in that case claimed that Order No. 436 itself, even before FERC gave it the broad interpretation challenged in the present cases, impermissibly expanded Sec. 311 transportation to the point where it was indistinguishable from Sec. 7 transportation. The petitioner argued that transportation had taken place under Sec. 311 in which the "on behalf of" requirement was "fulfilled more in name than in reality," and that in one instance "the contact with an LDC consist[ed] only of transportation through a six-foot stretch of pipe." 824 F.2d at 1040. This court did not explicitly pass on whether FERC could expand Sec. 311 to the point where it melded into Sec. 7, because it did "not believe that petitioners have shown a sufficient identity between Sec. 311 and Sec. 7 transportation to call FERC's judgment into question." Id. The court noted that "we are shown no evidence that Sec. 311 transportation frequently--much less unformly [sic]--pivots on a merely nominal connection with an LDC or other pipeline." Id. (This sentence is unfortunately garbled in the West reporter; we quote here from the slip opinion.) While the court did not pass on an issue that was not before it, its language suggests that a "merely nominal connection with an LDC or other pipeline" could not fulfill Sec. 311's "on behalf of" requirement
 
 
 [10]
 Tejas claims that the relief requested by AGD cannot be granted in the Texas Eastern case because of res judicata and collateral estoppel. This is incorrect. It is true that in an earlier proceeding, FERC accepted Texas Eastern's tariff for filing and approved its language. However, that earlier proceeding, although approving the tariff's language, did not deal with the particular interpretation of that language that is at issue in the proceedings now on review